EARL FOREMAN ET AL., APPELLANTS, V.
AS MID-AMERICA, INC., APPELLEE.
586 N.W. 2d 290

Filed September 25, 1998.   Nos. S-97-209 through S-97-222.

Alan L. Plessman and Susan I. Strong, of Plessman Law Offices, for appellants.

Joseph S. Turner, of Seyfarth, Shaw, Fairweather & Geraldson, and Douglas J. Peterson, of Knudsen, Berkheimer, Richardson & Endacott, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, and McCORMACK, JJ., and HASTINGS, C.J., Retired.

PER CURIAM.

This case involves a consolidated lawsuit brought by 14 former AS Mid-America, Inc., employees as a result of a labor strike that occurred at the AS Mid-America printing plant located in Lincoln, Nebraska. The question presented is whether these 14 nonunion employees' various breach of contract claims, fraudulent misrepresentation claims, and intentional infliction of emotional distress claims are preempted by either § 301 of the Labor Management Relations Act (LMRA), codified at 29 U.S.C. § 171 et seq. (1994), or the National Labor Relations Act (NLRA), 29 U.S.C. § 157 et seq. (1994).

On January 18, 1994, 10 of the 14 appellants filed suit against AS Mid-America in the Lancaster County District Court. Appellants subsequently amended their petitions on December 11, 1995, adding four additional appellants. The 14 appellants are Dene Dixon, Larry Masters, Michael Riggs, Brian Faust, Ralph Chloupek, Jeffrey Reedy, Michael Werger, Raymond Thomason, Kenneth Chloupek, Paul Rada, Jerry Study, Kent Watson, Jr., Earl Foreman, and Lynn Dowding. Appellants' second amended petitions sought damages against AS Mid-America for the company's alleged breach of a third-party beneficiary contract, breach of an oral contract, breach of an implied unilateral contract, fraudulent misrepresentation, and intentional infliction of emotional distress.

On January 9, 1996, AS Mid-America denied the allegations therein, contending that appellants' claims were preempted by the NLRA, preempted by § 301 of the LMRA, barred by the

applicable statute of limitations, barred for failure to exhaust administrative remedies, and improperly joined. On May 28, AS Mid-America filed a motion for summary judgment based on these same allegations, generally claiming that there was no genuine issue as to any material fact. On January 30, 1997, the district court granted AS Mid-America's motion for summary judgment, finding that appellants' claims were preempted by the NLRA. Appellants filed an appeal in the Nebraska Court of Appeals on February 18, and we removed the case to our docket pursuant to our power to regulate the caseloads of the Court of Appeals and this court. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

Appellants' sole assignment of error is that the Lancaster County District Court erred in sustaining AS Mid-America's motion for summary judgment, finding appellants' causes of action preempted by the NLRA.

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Houghton v. Big Red Keno*, 254 Neb. 81, 574 N.W.2d 494 (1998); *Barnett v. Peters*, 254 Neb. 74, 574 N.W.2d 487 (1998). On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998); *Gans v. Parkview Plaza Partnership*, 253 Neb. 373, 571 N.W.2d 261 (1997). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Barnett v. Peters, supra*; *Chalupa v. Chalupa*, 254 Neb. 59, 574 N.W.2d 509 (1998). In an appellate review, the grant of a motion for summary judgment may be affirmed on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon. *Logan Ranch v. Farm Credit Bank*, 238 Neb. 814, 472 N.W.2d 704 (1991). See, also, *Gustin v. Scheele*, 250 Neb. 269, 549 N.W.2d 135 (1996); *Crystal Clear Optical v. Silver*, 247 Neb. 981, 531

N.W.2d 535 (1995); *Wymore v. Wymore*, 239 Neb. 940, 479 N.W.2d 778 (1992).

A summary judgment motion based on jurisdictional grounds is treated as and serves the same purpose as a demurrer on jurisdictional grounds. *Concerned Citizens v. Department of Environ. Contr.*, 244 Neb. 152, 505 N.W.2d 654 (1993); *Kerndt v. Ronan*, 236 Neb. 26, 458 N.W.2d 466 (1990); *Nelson v. Sioux City Boat Club*, 216 Neb. 484, 344 N.W.2d 634 (1984). A summary judgment motion based on a jurisdictional defect is treated the same as a demurrer based on a jurisdictional defect for purposes applying the rule regarding repleading. *Concerned Citizens v. Department of Environ. Contr., supra.* Consequently, after a summary judgment motion on jurisdictional grounds has been granted, but where a reasonable possibility exists that the jurisdictional defect may be cured by amendment and a cause of action may be stated, denying the plaintiff the opportunity to replead is an abuse of discretion. *Id.*

Resolving every controverted fact in favor of appellants and affording them the benefit of every reasonable inference deducible from the evidence, we note the following is disclosed: This suit arose out of a labor strike that occurred on April 27, 1993, at AS Mid-America's commercial printing plant located in Lincoln, Nebraska. Before the strike, the Lincoln plant was unionized and operated under a collective bargaining agreement (CBA) between AS Mid-America and the Graphic Communi-cations International Union, Local Nos. 520 and 221, and the International Association of Machinists Union, Local No. 31. In March 1993, the CBA was to be renewed and negotiations were under way. However, when negotiations broke down and new collective bargaining terms failed to be established, the CBA expired and a strike ensued. On April 27, the 690 unionized employees went on strike. As a consequence, no CBA was in effect at the AS Mid-America plant as of April 27.

To continue operations, AS Mid-America needed workers to fill the vacancies created by the strike. AS Mid-America decided to hire permanent replacement workers and to urge regular, prestrike (crossover) employees to cross picket lines and continue working. Many people, including appellants, applied to fill the vacant job positions created by the ensuing strike. To

encourage people to accept these positions and continue working after the strike, AS Mid-America orally promised each individual applicant that they would have a permanent job, that they could work at AS Mid-America for as long as they wanted, and that they would be able to work in an environment free from harassment and intimidation if and when the strikers returned.

AS Mid-America eventually hired approximately 46 permanent replacement workers, and approximately 83 employees abandoned the strike and returned to work as crossover employees. Appellants include 13 permanent replacement workers and 1 crossover worker.

Upon hiring, each new employee was given a copy of AS Mid-America's "Rules of Conduct" and was asked to sign an "Employee Acknowledgment Receipt" form. The form stated that the employee had read, understood, and agreed to abide by the rules of conduct. The rules of conduct addressed three levels of employee misconduct and the respective consequences. The rules specifically discussed intolerable violations, warranting immediate suspension awaiting discharge; major violations, warranting suspension; and minor violations, warranting a written warning on the first violation, suspension on the second violation, and suspension awaiting discharge on the third violation.

On May 13, 1993, AS Mid-America and the unions settled the dispute and ended the strike. As part of the settlement, the unions signed a strike settlement agreement entitled "Return to Work Resolution" and began the process of ratifying new CBAs. The return to work resolution effectively terminated the strike and provided mechanisms designed to "return Company operations to normal." The return to work resolution contained a promise from AS Mid-America and the unions, essentially summarizing the prior oral promises made to each individual employee that he or she could stay at AS Mid-America as long as he or she wanted and that the company would protect them from discrimination and harassment. The provision in the return to work resolution specifically stated that "[t]here shall be no intimidation, discrimination, or harassment because of any person's participation or non-participation in the strike."

A new CBA was signed on September 20, 1993, and became retroactively effective on May 13, 1993.

The strikers returned to work on May 14, 1993. As the employees entered the AS Mid-America plant, the company distributed a letter to all employees, signed by Dennis Hiser, AS Mid-America's division director, summarizing the prior oral promises made to the permanent replacement and crossover workers. The letter reiterated the oral promises, couching the promises in terms of the return to work resolution. The letter provided, in pertinent part:

> The Return to Work Resolution also contains a commitment from both the Company and the Unions that "there shall be no intimidation, discrimination, or harassment because of any person's participation or non-participation in the strike." . . . Management of the Company will be closely monitoring the behavior of all employees to make sure that this provision is enforced. Any intimidation, discrimination, or harassment which does occur will be dealt with swiftly, and those individuals responsible will be subject to appropriate discipline.

That same day, AS Mid-America also held various employee meetings throughout the plant. At these meetings, the company's division director and other management officials again summarized the oral promises that were previously made to the permanent replacement and crossover workers during the initial hiring stage (now also contained in the return to work resolution) and specifically told all employees that there would be no intimidation, discrimination, or harassment of any employees and that those guilty of such harassment would be strictly disciplined. The employees were told to report any such intimidation, discrimination, or harassment directly to their supervisors.

Despite AS Mid-America's initial oral promises to the permanent replacement and crossover workers, the inclusion of the oral promises in the return to work resolution, and the Hiser letter, union employees conducted a campaign of harassment and intimidation against the permanent replacement and crossover workers. The discrimination and intimidation included various forms of verbal, physical, and psychological harassment inside the plant during working hours and also outside the plant after working hours. The harassment included, but was not limited to, nonunion members' being followed home after work by union

members, name calling, physical threats, union members' placing threatening telephone calls to the homes of nonunion members, various forms of property damage, and in one extreme situation, a nonunion employee's having dog feces spread on the clothes in his locker.

The harassment and intimidation became so intense that several appellants attempted to speak with union officials to seek union membership. These appellants thought that becoming members of the union might alleviate some of the harassment. Such attempts were useless. Union officials either refused to talk to the employee or told the inquiring employee that union membership was out of the question.

As a result of the harassment, 12 of the 14 appellants quit their jobs and allege they were constructively discharged. Of the two other employees, one was discharged for alleged unsatisfactory work performance and the other was laid off allegedly because of downsizing in the work force.

Based on these events, appellants filed suit against AS Mid-America and alleged five separate causes of action. First, appellants claim AS Mid-America breached the terms of the return to work resolution. Appellants claim damages under this contract via third-party beneficiary law. Second, appellants claim AS Mid-America breached the terms of the rules of conduct. Third, appellants claim AS Mid-America breached a unilateral contract which was formed when AS Mid-America distributed the Hiser letter to all employees. Fourth, appellants claim AS Mid-America committed fraudulent misrepresentation when the company, intending to deceive prospective employees, made specific promises regarding job security and permanency that the company knew to be false. Fifth, appellants contend AS Mid-America caused intentional infliction of emotional distress by either permitting or passively condoning the union employees' verbal, physical, and psychological harassment, intimidation, and discrimination of the permanent replacement and crossover workers. The second amended petition also discloses that appellants seem to rely on the oral contract formed during the initial hiring stage, when company representatives promised each individual employee that the job was permanent and that no discrimination or harassment would occur if the strikers returned.

We will initially address the viability of the oral contract allegedly formed during the initial hiring stages. This cause of action appears on the face of the second amended petition but is not specifically relied upon as a distinct cause of action. The law is clear that a summary judgment motion based on a jurisdictional defect is treated the same as a demurrer based on a jurisdictional defect for purposes of applying the rule regarding repleading. *Concerned Citizens v. Department of Environ. Contr.*, 244 Neb. 152, 505 N.W.2d 654 (1993). Consequently, after a summary judgment motion on jurisdictional grounds has been granted, but where there is a reasonable possibility that the jurisdictional defect may be cured by amendment and a cause of action may be stated, denying the plaintiff the opportunity to replead is an abuse of discretion. *Id.* As AS Mid-America's motion for summary judgment was granted on jurisdictional grounds, we must first determine whether appellants could replead their second amended petitions and specifically state a cause of action for breach of the oral contract formed during the initial hiring stages.

Before addressing the merits of the alleged oral contract claim, we must initially determine whether appellants' cause of action based on the oral contract could be preempted under the NLRA. Under the NLRA, there are two doctrines for determining whether state regulations or causes of action are preempted. The first, articulated in *San Diego Unions v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959), provides that state causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by the NLRA. In *Garmon*, the Supreme Court stated that a state cause of action may, however, be sustained if the behavior sought to be regulated is of only peripheral concern to federal labor law or touches interests deeply rooted in local feeling and responsibility. See, e.g., *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 98 S. Ct. 1745, 56 L. Ed. 2d 209 (1978); *Farmer v. Carpenters*, 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977); *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966). The Court in *Garmon* stated that in such cases, the state's interest in controlling or remedying the effects of the conduct is balanced against both the interference

with the NLRA's ability to adjudicate controversies committed to the National Labor Relations Board (NLRB) by the NLRA and the risk that the state will sanction the conduct that the NLRA protects.

The second preemption doctrine, set forth in *Machinists v. Wisconsin Emp. Rel. Comm'n*, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976), proscribes state regulations and state law causes of action which concern conduct that Congress intended to be unregulated and that was to remain a part of the self-help remedies left to the combatants in labor disputes. In *Machinists*, the Court stated that the crucial inquiry is whether Congress intended the conduct involved to be unregulated because the conduct should be left to be controlled by the free play of economic forces. The Court reasoned that " '[f]or a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.' " 427 U.S. at 144 (quoting *Garner v. Teamsters Union*, 346 U.S. 485, 74 S. Ct. 161, 98 L. Ed. 228 (1953)). The Court determined that the crucial inquiry is whether the exercise of state power to curtail or prohibit self-help mechanisms will frustrate the implementation of the NLRA's processes.

In resolving this issue, we find guidance from the Supreme Court's holding in *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S. Ct. 3172, 77 L. Ed. 2d 798 (1983). In *Belknap, Inc.*, the U.S. Supreme Court addressed the question of whether the NLRA preempted a misrepresentation and breach of contract action brought against an employer, in state court, by strike replacement workers who were displaced by reinstated strikers after they had been offered and had accepted jobs on a permanent basis, and had been assured they would not be fired to accommodate returning strikers.

Belknap, Inc., was a corporation selling hardware products and building materials. A bargaining unit consisting of all of Belknap's warehouse and maintenance employees selected the International Brotherhood of Teamsters as their collective bargaining representative. In 1975, the union and Belknap entered into an agreement which was scheduled to expire on January 31, 1978. Negotiations were under way to renew the CBA but,

shortly before the expiration of the agreement, an impasse occurred. As a result, on February 1, approximately 400 union employees went on strike.

To continue operating, Belknap granted a wage increase for those union employees who stayed on the job and, in addition, placed an advertisement in the local newspaper seeking applicants to " 'permanently replace striking warehouse and maintenance employees.' " 463 U.S. at 494. After each replacement worker was hired, Belknap presented to the replacement worker the following statement for his or her signature: " 'I, the undersigned, acknowledge and agree that I as of this date have been employed by Belknap, Inc. at its Louisville, Kentucky, facility as a regular full time permanent replacement to permanently replace _____ in the job classification of _____.' " 463 U.S. at 494-95.

On March 7, 1978, the union filed unfair labor practice charges against Belknap. The charge was based on the wage increase granted by Belknap. On April 4, the company distributed a letter which stated, in pertinent part:

" 'TO ALL PERMANENT REPLACEMENT EMPLOYEES

. . . .

" 'We recognize that many of you continue to be concerned about your status as an employee. The Company's position on this matter has not changed nor do we expect it to change. You will continue to be permanent replacement employees so long as you conduct yourselves in accordance with the policies and practices that are in effect here at Belknap.

. . . .

" 'We continue to meet and negotiate in good faith with the Union. It is our hope and desire that a mutually acceptable agreement can be reached in the near future. However, we have made it clear to the Union that we have no intention of getting rid of the permanent replacement employees just in order to provide jobs for the replaced strikers if and when the Union calls off the strike.' "
463 U.S. at 495.

On April 27, 1978, the regional director of the NLRB also "issued a complaint against Belknap, asserting that the wage

increase violated §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the [NLRA]." *Id.* Also on April 27, company officials again addressed the strike replacement workers and stated:

> "'We want to make it perfectly clear, once again, that there will be no change in your employment status as a result of the charge by the National Labor Relations Board, which has been reported in this week's newspapers.
>
> "'We do not believe there is any substance to the charge and we feel confident we can prove in the courts satisfaction that our intent and actions are completely within the law.'"

*Belknap, Inc. v. Hale*, 463 U.S. 491, 496, 103 S. Ct. 3172, 77 L. Ed. 2d 798 (1983).

A hearing on the unfair labor practice charges was scheduled for July 19, 1978. At the hearing, the regional director explained that if a settlement agreement could be reached, he would withdraw the unfair labor practice charges. During these discussions, the parties made various concessions, leaving one major issue unresolved, the recall of the striking employees. The parties finally agreed that the company would reinstate 35 strikers per week. The settlement agreement was then reduced to writing. Belknap proceeded to lay off the replacement workers to make room for the returning strikers.

The replacement workers sued Belknap in state court for misrepresentation and breach of contract. Belknap, after unsuccessfully seeking to remove the suit to federal court, moved for summary judgment on the ground that the replacement workers' causes of action were preempted by the NLRA. The trial court agreed and granted summary judgment. The Kentucky Court of Appeals reversed the trial court's order, concluding the suit was not preempted because the contract and misrepresentation claims were of only peripheral concern to the NLRA and were not deeply rooted in local law. The Kentucky Supreme Court granted discretionary review, but later vacated its order. The U.S. Supreme Court granted Belknap's petition for certiorari and affirmed the Kentucky Court of Appeals' decision.

The Court initially conducted an overview of the preemption doctrines articulated in *San Diego Unions v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959), and *Machinists v.*

*Wisconsin Emp. Rel. Comm'n*, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976). The Court then proceeded to determine whether the misrepresentation or breach of contract claims were preempted under *Machinists*. In so doing, the Court considered whether allowing such suits to proceed in state court would disrupt the delicate balance of forces established by federal law. The Court rejected this suggestion and noted that to allow an employer's otherwise valid promise of permanent employment to be nullified by federal law and to deny an otherwise valid contract claim would make little or no sense. The Court specifically stated that when an employer attempts to exercise the privilege of hiring permanent replacement workers by telling them that

> they will not be discharged to make room for returning strikers, it surely does not follow that the employer's otherwise valid promises of permanent employment are nullified by federal law and its otherwise actionable misrepresentations may not be pursued. . . . We find unacceptable the notion that the federal law on the one hand insists on promises of permanent employment if the employer anticipates keeping the replacements in preference to returning strikers, but on the other hand forecloses damages suits for the employer's breach of these very promises.

463 U.S. at 500.

The Court in *Belknap, Inc.*, then stated that holding that federal law intends to leave employers and unions free to use their economic weapons against one another is one thing, but holding that either the employer or the union is also free to injure innocent third parties without regard to the normal rules of law governing those relationships is quite another.

The Court also discarded the claim that such suits will interfere with the asserted policy of the NLRA. The Court stated that such a suggestion "is just another way of asserting that the employer need not answer for its repeated assurances of permanent employment or for its otherwise actionable misrepresentations to secure permanent replacements." 463 U.S. at 501. The Court concluded that the misrepresentation and breach of contract actions were not preempted under *Machinists* because Congress did not intend such conduct to be unregulated and that

permitting such actions to proceed in state court would not substantially impair the self-help remedies left to combatants in labor disputes.

The Court in *Belknap, Inc.*, then turned to determining whether the claims should be preempted by *Garmon*. The Court began by stating that under the *Garmon* preemption doctrine, a state may regulate conduct that is of only peripheral concern to the NLRA or that is so deeply rooted in local law that the courts should not assume Congress intended to preempt the application of state law. The Court then discussed prior Supreme Court precedent where the Court determined that the state law cause of action was not preempted by federal labor law. The Court discussed the holdings in *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966) (state cause of action for false and malicious statements); *Farmer v. Carpenters*, 430 U.S. 290, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977) (state cause of action for intentional infliction of emotional distress); and *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 98 S. Ct. 1745, 56 L. Ed. 2d 209 (1978) (state cause of action for trespass). From these cases, the Court determined that the critical inquiry was whether the conduct at issue or the controversy presented was identical to that which could be presented to the NLRB. In the prior cases, the Court in *Belknap, Inc.*, stated the controversies could not be called identical because the facts and issues to be addressed in state court would not be the same as those examined in an NLRB action. The Court determined that the facts and issues presented by the misrepresentation and breach of contract actions in the case at bar would also not be identical to an NLRB action, and specifically stated that whether the strike was an unfair labor practice strike and whether the offer made to replacement workers was the kind of offer forbidden during such a dispute were matters for the NLRB. The Court stated, however, that the focus of these determinations would be on whether the rights of the strikers were being infringed upon, and determined that neither controversy would have anything in common with the question of whether Belknap made misrepresentations to replacement workers that were actionable under state law—the NLRB would be con-

cerned with the impact on the strikers, not with whether the employer deceived the replacement workers.

The Court additionally noted that state courts clearly have a substantial interest in protecting their citizens from misrepresentations causing grievous harm. The Court noted that the injury remedied by state law has no relevance to the NLRB's function, as the NLRB cannot award damages, impose penalties, or provide any other relief. It therefore concluded that the causes of action were not preempted because maintaining a misrepresentation action would not interfere with the NLRB's determination of matters within its jurisdiction and that such an action is of no more than peripheral concern to the NRLB and the federal labor law. *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S. Ct. 3172, 77 L. Ed. 2d 798 (1983).

Considering the Supreme Court's holding in *Belknap, Inc.*, we find that appellants' cause of action based on the alleged oral contract is preempted by the NLRA. While the facts of *Belknap, Inc.*, seem to suggest that the breach of contract claim would not be preempted, we find the facts in *Belknap, Inc.*, distinguishable from those in the case at bar. In *Belknap, Inc.*, the employer promised the replacement workers nothing more than permanent employment. In the instant case, AS Mid-America promised the replacement workers not only permanent employment, but also protection from harassment, discrimination, and intimidation. These promises of harassment-free employment were made by AS Mid-America officials. The failure to fulfill these promises and/or the condonation of the acts committed by the union employees is actually or arguably prohibited by the NLRA. *San Diego Unions v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959). See, also, *Newport News Shipbuilding & Dry Dock Company*, 236 NLRB 1499, 1508-09 (1978) (holding that "[b]y acquiescing in, condoning, ratifying, and failing to resist the illegal acts and conduct of the [union], Respondent Employer has contributed assistance and support to [the union], and thereby engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(2) of the [NLRA]"); *Brewton Fashions, Inc., a Division of Judy Bond*, 145 NLRB 99, 127 (1963) (holding that "[t]he [NLRA] imposes an affirmative

duty upon an employer to insure that his obligation to maintain discipline in the plant and to provide his employees with the opportunity to work without interference from their coworkers, is not delegated or surrendered to any union or antiunion group, and an employer who acquiesces in the exclusion of employees from his plant by such a group will be regarded as having discriminated against the excluded employees in violation of Section 8(a)(3)"). As a consequence, such conduct and/or failure to act is not merely a peripheral concern to federal labor law, but, rather, is so inextricably intertwined with federal labor law that to do other than preempt appellants' alleged breach of contract claims would obfuscate the NLRB's ability to adjudicate controversies committed to the NLRB by the NLRA. Moreover, the conduct at issue and the controversy presented is identical to that which would be presented to the NLRB. The conduct attributed by appellants to AS Mid-America—the failure to protect its employees from harassment—would be, if proved, both a breach of the putative oral contract and a violation of federal labor law. Therefore, the focus of the state law breach of contract action and NLRB determinations would be the same—whether AS Mid-America acted or failed to act such that its replacement workers were subjected to harassment. We find that appellants' alleged oral contract claims are preempted by the NLRA.

Considering our standard of review in cases where summary judgment was granted based on a jurisdictional defect, we find the district court did not abuse its discretion in denying appellants the opportunity to replead. As demonstrated above, appellants' breach of contract claim is preempted by the NLRA. We find that the district court was correct in granting summary judgment regarding this issue and in denying appellants the opportunity to replead.

We will now address the first cause of action stated in appellants' second amended petition. Appellants claim the statements contained in the return to work resolution, that there shall be no harassment or intimidation, created a contract between the unions and AS Mid-America which appellants are entitled to benefit from as third-party beneficiaries. AS Mid-America responds by claiming that the return to work resolution is a con-

tract within the purview of § 301 and is therefore preempted. The question then becomes whether the return to work resolution is a contract within the meaning of § 301. This question was addressed and resolved by the U.S. Supreme Court in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985), and *Retail Clerks v. Lion Dry Goods*, 369 U.S. 17, 82 S. Ct. 541, 7 L. Ed. 2d 503 (1962).

In *Allis-Chalmers Corp.*, the Court recognized that the preemptive force of § 301 cannot be limited to only the terms of CBAs. The Court stated that "[i]f the policies that animate § 301 are to be given their proper range . . . the pre-emptive effect of § 301 must extend beyond suits alleging contract violations." *Allis-Chalmers Corp.*, 471 U.S. at 210. The Court went on to state:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.

*Allis-Chalmers Corp.*, 471 U.S. at 211. From the Supreme Court's holding, we determine that § 301 does not apply only to CBAs, or those agreements arrived at through the collective bargaining process.

In *Retail Clerks v. Lion Dry Goods, supra*, the Supreme Court addressed a similar issue as in the present case. In *Lion Dry Goods*, a labor strike erupted when negotiations for the renewal of a new CBA ended in an impasse. Negotiation and mediation subsequently proceeded, ultimately resulting in a strike settlement agreement containing various provisions intended to facilitate returning the strikers to work. In particular, the strike settlement agreement contained a provision which

stated, in pertinent part, that "[n]o employee will be discriminated against, by reason of Union activities, membership or non-membership." 369 U.S. at 21 n.4. Other provisions in the strike settlement agreement addressed, but were not limited to, seniority, reinstatement, wage and hour schedules, working conditions, union membership, and other benefits. The strike settlement agreement was essentially " 'the basis on which the heretofore existing dispute . . . [wa]s to be fully and finally resolved.' " 369 U.S. at 22. After negotiating these provisions and agreeing to the reciprocal promises contained therein, the strike settlement agreement was agreed upon and the labor dispute was terminated. A few months later, however, a new dispute arose, precipitating an appeal to the U.S. Supreme Court.

The issue on appeal was whether the strike settlement agreement was a contract within the purview of § 301. In resolving this issue, the Court in *Lion Dry Goods* began by noting that both the U.S. District Court and the U.S. Court of Appeals for the Sixth Circuit viewed the crucial question as whether the strike settlement agreement constituted a contract contemplated by § 301. The Supreme Court read the lower courts' rulings as basically holding that there are only certain kinds of contracts within the purview of § 301 and that the strike settlement agreement was not one of them. The Court read the lower courts' holdings as meaning that to be within § 301, contracts must either be collective bargaining agreements or agreements arrived at through the collective bargaining process. The Court rejected this interpretation of § 301 and specifically stated that the plain words of the statute negated such a narrow construction. *Retail Clerks v. Lion Dry Goods*, 369 U.S. 17, 82 S. Ct. 541, 7 L. Ed. 2d 503 (1962). The Court determined that the purpose of § 301 would be defeated if such contracts were excluded from those cognizable under § 301. *Id.* The Court explained that if these types of agreements were determined to be unenforceable under § 301, labor relations would suffer and the ultimate goal of minimizing disruption of interstate commerce would be made more difficult. The Court noted that "[i]t is no answer that in a particular case the agreement might be enforceable in state courts: a main goal of § 301 was precisely to end 'checkerboard jurisdiction.' " 369 U.S. at 27. The Court concluded that it need

not decide whether the strike settlement agreement is a collective bargaining agreement, but, rather, it is enough that the strike settlement agreement is an agreement between employers and unions significant to industrial peace. The Court ruled that the strike settlement agreement was within the purview of § 301 because the agreement was created as a means to facilitate and regulate industrial peace, i.e., to terminate the labor strike and the picketing, and to return the strikers to their jobs.

The Supreme Court's holding in *Lion Dry Goods* controls. In the instant case, as in *Lion Dry Goods*, a labor strike ensued and a mutual agreement was reached, intending to return working conditions to normal. As in *Lion Dry Goods*, the return to work resolution was a mutual agreement that AS Mid-America and union members negotiated and agreed upon, which essentially ended the strike and returned working conditions to normal. Just as in *Lion Dry Goods*, the return to work resolution addressed several issues significant to reestablishing and maintaining industrial peace, such as seniority, job classification, and job placement. The return to work resolution also provided mechanisms for resolving a number of other issues, such as layoffs, overtime, vacations, grievance procedures, and shift bumping.

We believe that the return to work resolution, just as the strike settlement agreement in *Lion Dry Goods*, falls within the purview of § 301. The return to work resolution was an agreement between the unions and AS Mid-America and was significant to maintaining industrial peace. The return to work resolution was mutually agreed upon with the intentions of ending the strike and returning working conditions to normal. As the return to work resolution resolved a labor controversy and arose out of the employment relationship, the return to work resolution plainly falls within the ambit of § 301. As such, any reliance by appellants upon the return to work resolution, directly or via third-party beneficiary rights, is preempted by federal labor law. We therefore find that appellants' claims based on the return to work resolution are preempted by § 301 of the LMRA and need not be analyzed.

Appellants' second cause of action is based on an implied contract premised on AS Mid-America's rules of conduct. Appellants claim that by issuing each new employee a copy of

the rules of conduct upon hiring, AS Mid-America entered into an implied contract whereby the company agreed to enforce the rules of conduct. Appellants claim AS Mid-America breached this implied contract by failing to discipline other employees in accordance with the rules and by permitting the returning strikers to conduct a campaign of harassment against appellants. AS Mid-America responds by claiming that the rules of conduct constitute part of the terms and conditions of employment at AS Mid-America. AS Mid-America argues that the application of the rules of conduct are subject to challenge through the grievance procedure contained in the CBA and, as such, are preempted by § 301.

As discussed above, the rules of conduct address three levels of employee misconduct: intolerable violations, major violations, and minor violations, each having different punishable offenses and degrees of punishment. Each new employee was given a copy of the rules upon hiring, along with an "Employee Acknowledgment Receipt" form, which indicated the employee had read and understood the rules. AS Mid-America argues the rules of conduct are part and parcel of the CBA and, in turn, any claim based on the rules is preempted by § 301.

The record discloses that at the time the rules were issued to these new employees, no CBA was in effect. A strike had erupted, and the CBA failed to exist as of April 27, 1993. Essentially, then, AS Mid-America suggests that the rules of conduct were meaningless and had no binding legal effect until the new CBA was in place, May 13. We do not agree. Rather, from our own holdings, we know that employee handbooks, rules, and oral representations can be the bases for a contractual obligation with or without the existence of a CBA. See, e.g., *Overmier v. Parks*, 242 Neb. 458, 495 N.W.2d 620 (1993); *Hebard v. AT&T*, 228 Neb. 15, 421 N.W.2d 10 (1988); *Johnston v. Panhandle Co-op Assn.*, 225 Neb. 732, 408 N.W.2d 261 (1987); *Jeffers v. Bishop Clarkson Memorial Hosp.*, 222 Neb. 829, 387 N.W.2d 692 (1986). In addition, § 301 has no bearing on the validity or invalidity of such individual employment contracts. As the Supreme Court stated in *Caterpillar Inc. v. Williams*, 482 U.S. 386, 395, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987), "[s]ection 301 governs claims founded directly on

rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' . . . Section 301 says nothing about the content or validity of individual employment contracts." See, e.g., *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985). Moreover, the Supreme Court has stated that to determine whether a particular state law cause of action is preempted by § 301, a court must ascertain whether the resolution of the state law claim is dependent upon the construction of the collective bargaining agreement. *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988). Here, the rules of conduct could in no way be dependent upon a construction of the CBA because the CBA did not exist when the rules of conduct were issued. Appellants' implied contract claims based on the rules of conduct are not preempted by § 301.

However, even if § 301 does not preempt appellants' state contract claim based on the rules of conduct, such agreements are enforceable only if they meet the requirements of a contract. See *Overmier, supra.* In *Overmier*, we said that the language relied upon must contain "an offer definite in form which is communicated to the offeree, and the offer is accepted and consideration furnished for its enforceability . . . ." *Id.* at 462, 495 N.W.2d at 623. We also stated that there must also be a binding mutual understanding between the parties to the alleged contract. *Overmier, supra.* See, e.g., *Woods v. Woods*, 177 Neb. 542, 129 N.W.2d 519 (1964).

In the present case, the rules of conduct contain no clear offer of definite employment. The rules address nothing other than employee discipline. There is also no evidence in the record that either party understood the rules of conduct as creating an implied contract. We find that the language contained in the rules of conduct is insufficient to rise to the level of an offer of employment. Therefore, appellants' second basis of recovery lacks merit and fails to create a genuine issue of material fact.

Appellants' third cause of action is premised on an alleged unilateral contract formed when the letter authored by Hiser was distributed to all employees after the strike ended. The letter summarized the prior oral promises made to each individual

applicant during the initial hiring stage that they would be able to work in an environment free from harassment, intimidation, or discrimination. The letter stated these promises in terms of the return to work resolution. However, the record reflects that the return to work resolution actually summarized the prior oral promises made by AS Mid-America to appellants.

We have already determined that the alleged oral contract and the return to work resolution are preempted by federal labor law. Because the Hiser letter essentially summarized the promises contained in the oral contract and the return to work resolution that are both preempted, the Hiser letter is also preempted. We find that appellants' third cause of action is preempted by the NLRA and presents no further need for review.

In the fourth cause of action, appellants claim AS Mid-America committed fraudulent misrepresentation when the company made specific promises regarding job permanency that the company knew were false. To recover in an action for fraud based on misrepresentation of a material fact, a plaintiff must prove that (1) the defendant represented a material fact; (2) the represented fact was untrue; (3) the defendant knew that the represented fact was untrue, recklessly made the representation as a positive assertion without knowledge concerning the truth of the representation, or made the representation negligently as the result of a lack of reasonable care in ascertaining the fact represented or in the absence of skill and competence required by a particular business or profession; (4) the misrepresentation was made with the intention that the plaintiff would rely on it; (5) the plaintiff reasonably relied on the misrepresentation; and (6) as the result of such reliance, the plaintiff was damaged. *Ed Miller & Sons, Inc. v. Earl*, 243 Neb. 708, 502 N.W.2d 444 (1993); *Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 481 N.W.2d 416 (1992).

The record discloses sufficient evidence which presents a genuine issue of material fact. First, AS Mid-America did in fact make representations to appellants that they would have permanent employment in a harassment-free environment. Second, given the facts present in the instant case, AS Mid-America did not, in fact, protect appellants. Third, although there is no evidence or testimony indicating that AS Mid-

America knew the represented facts were untrue, the record contains evidence indicating that AS Mid-America knew that the harassment, intimidation, and discrimination were occurring, yet the company either ignored the conduct or passively condoned the conduct. Fourth, the record shows that AS Mid-America made the representations with the intention that appellants would rely on them; AS Mid-America knew that the only way the company could obtain workers during the strike was to promise job applicants that no harassment or intimidation would occur or be tolerated. Finally, the record shows that appellants relied on these representations and were damaged as a result. We find that appellants' claim for fraudulent misrepresentation presents a genuine issue of material fact.

Whether this claim is preempted under federal labor law is another question. Neither § 301 nor the NLRA preempts appellants' cause of action for fraudulent misrepresentation. Appellants' claim does not involve a contract between a labor organization and an employer; thus, § 301 is not implicated. Similarly, in *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S. Ct. 3172, 77 L. Ed. 2d 798 (1983), the U.S. Supreme Court held that a claim for misrepresentation is not preempted by the NLRA. In so holding, the Court initially noted that state courts clearly have a substantial interest in protecting their citizens from misrepresentations causing grievous harm. The Court further noted that the injury remedied by state law has no relevance to the NLRB's function, as the NLRB cannot award damages, impose penalties, or give any other relief. The Court concluded that the cause of action was not preempted because maintaining a misrepresentation action would not interfere with the NLRB's determination of matters within its jurisdiction and that such an action is of no more than peripheral concern to the NLRB and the federal labor law.

We find that the district court erred in granting summary judgment regarding appellants' claims for fraudulent misrepresentation as appellants' claims state a cause of action for fraudulent misrepresentation and the claim is not preempted by federal labor law.

In the fifth cause of action, appellants claim AS Mid-America caused intentional infliction of emotional distress by

permitting the union employees to harass and intimidate the nonunion employees. To recover for intentional infliction of emotional distress, the plaintiff must show that (1) there has been intentional or reckless conduct, (2) the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Gall v. Great Western Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985).

In this regard, appellants claim AS Mid-America intentionally caused them emotional distress by permitting union employees to conduct a campaign of harassment and intimidation. Although it is a fact that harassment and intimidation occurred on and off AS Mid-America premises, the conduct which appellants complain of was not perpetrated by AS Mid-America, but, rather, by the union employees. To hold AS Mid-America responsible for the wrongdoings of the union members is a step which cannot be made absent a special relationship. See, *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998); *Merrick v. Thomas*, 246 Neb. 658, 522 N.W.2d 402 (1994). Even if we set aside the special relationship requirement and determine that AS Mid-America could be held responsible for the union members' wrongdoings, none of the acts perpetrated by the union members were so outrageous in character and so extreme in degree as to be regarded as atrocious and utterly intolerable. See, *Nichols, supra*; *Gall, supra*. This court is unable to exclaim the required word, "outrageous." *Gall*, 219 Neb. at 364, 363 N.W.2d at 379-80 (holding that "[l]iability for the tort of outrage . . . exist[s] when, '[g]enerally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' "). The record is lacking even a scintilla of evidence indicating any of the appellants suffered from severe emotional distress. We therefore find that appellants' fifth cause of action lacks merit and does not create a genuine issue of material fact.

In sum, appellants' alleged oral contract claims and their first, second, third, and fifth causes of action lack merit and need not be reviewed on remand. However, we reverse, and remand on the fraudulent misrepresentation issue.

REVERSED AND REMANDED.

CAPORALE, J., not participating in the decision.

STEPHAN, J., not participating.