**James WILLARD, Appellant,**

v.

**KHOTOL SERVICES CORPORATION, Appellee.**

**No. S–12174.**

Supreme Court of Alaska.

Nov. 9, 2007.

---

Andrew J. Fierro, Law Office of Andrew J. Fierro, Inc., Anchorage, for Appellant.

Timothy Seaver, Seaver & Wagner, LLC, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

After being fired for alleged insubordination and violating workplace rules, James Willard sued his former employer, Khotol Services Corporation, for wrongful discharge, breach of employment contract, and breach of the implied covenant of good faith and fair dealing. The superior court dismissed Wil-

lard's original claims for breach of contract and implied-covenant claims on grounds of preemption by federal labor law. Willard filed an amended complaint that restated these claims in an effort to avoid the preemption problem; the amended complaint also added new claims based on misrepresentation and false representation. The superior court then granted summary judgment to Khotol on all of Willard's claims. Because Willard raised issues of material fact in connection with his implied-covenant claim, we reverse the superior court's dismissal of that claim. We also conclude that evidence tending to show that Khotol harbored ill will toward Willard because he became involved in union organizing activities may be admitted to support the implied-covenant claim he bases on theories unrelated to his union activities, so long as the evidence is independently relevant to the unrelated claim and creates no danger of being used to prove an essential element of the claim.

## II. FACTS AND PROCEEDINGS

### A. Facts

Willard worked for Khotol Services Corporation as a heavy equipment operator for approximately six weeks during the summer of 2003. He previously held a similar position as a civil service employee in the Department of Public Works at Fort Richardson. Willard applied for the job with Khotol after the Army decided to privatize the maintenance unit in which he worked and Khotol obtained the contract for that work. Before beginning work with Khotol, Willard was told that civil service employees losing their jobs on base had a "right of first refusal" to jobs with private contractors.

Willard completed and signed an employment application on May 21, 2003 that included the following disclaimer:

> I understand this application is not a contract and that acceptance of employment is not a contract of employment for a specified period of time. I understand and agree that I may resign my employment with Gana–A'Yoo, Ltd. [1] for any reason

and that my employment may be terminated at the will of Gana–A'Yoo, Ltd. at any time and for any reason. I also understand that any handbooks, manuals, policies and procedures maintained by Gana–A'Yoo, Ltd. are not contractual in nature and may be amended or abolished at the sole discretion of Gana–A'Yoo, Ltd.

Khotol interviewed Willard after receiving his employment application and offered him a position as a heavy equipment operator. Willard signed the written employment offer, called a company official to verbally accept, and then on June 2, 2003 personally returned the letter to the company's office.

On June 12, 2003, Willard attended a "pre-hire" meeting, where he was given a copy of Khotol's thirty-four-page employee manual; Willard signed for the manual but did not read it at that time. The manual included detailed policies and procedures on a number of topics, including probation, disciplinary procedures, misconduct, safety, and termination. The "Probation" section described a ninety-day probation period beginning on the date of hire. The manual characterized the probationary period as a "try-out time" for both employee and employer. It further stated that Khotol would evaluate the employee's "suitability for employment" and warned that, if the employee's "work habits, attitude, attendance or performance does not measure up to [Khotol's] standards, [Khotol] may release [the employee]."

Under the "Disciplinary Procedures" section, the manual described a system of progressive disciplinary measures and added that, "[e]xcept for extremely serious acts (assault, theft, insubordination, etc.), employees are not discharged for the first offense." The manual further stated that, "[n]o employee will be dismissed without just cause and all dismissals will be subject to the grievance procedures."

Finally, under the "Separation of Employment" section, the manual stated:

> Termination

1. Khotol is a subsidiary of Gana–A'Yoo, Ltd., an Alaska Native Corporation. *See* Khotol Services Corporation, Background, http://www.khotol. com/ksc_backgound.htm [sic] (last visited Oct. 31, 2007).

An employee may be terminated at any time for lack of job performance, insubordination, repeated incidents of minor violations of a similar nature and where there has not been an effort to improve, excessive absences and excessive tardiness.

Willard began working for Khotol on June 30, 2003. He was directly supervised by Rob Bellamy, but Steve Holtery served as acting supervisor in Bellamy's absence. Although hired as a heavy equipment operator, Willard performed various tasks for Khotol, including operating a refuse truck, teaching other employees truck routes, performing road maintenance, and servicing oil-water separators. According to Willard, Holtery began verbally harassing him and other former Department of Public Works employees soon after he began working for Khotol. For example, Willard alleges that Holtery told him that once other new employees had been trained, Khotol could "get rid of" all the former Department of Public Works employees, which included Willard. In response to Holtery's actions, Willard reviewed Khotol's policy on harassment, and then complained to Bellamy about Holtery's alleged verbal abuse. Although the employee manual directed employees to make all complaints of harassment in writing, Willard made only verbal complaints. According to Willard, this had little effect and the verbal harassment by Holtery continued even after he approached Bellamy.

During his brief tenure with Khotol, Willard also participated in an effort to secure union representation for Khotol employees. On one occasion, he organized and attended a meeting on union representation. Afterward, he spoke to several co-workers about joining the union. Willard asserts that both Bellamy and Holtery knew of the meeting and his interest in obtaining union representation.

On August 15, 2003, six weeks after his employment began, Bellamy and Khotol controller Douglas Koprowski confronted Willard and handed him a letter terminating his employment. The letter, signed by Bellamy, stated that the principal reason for Willard's termination was: "insubordination to the established line of authority of this company." The letter also stated that Willard had "re-fus[ed] to adapt to Company policy regarding shop and operational procedure."

Willard asserts that before his termination he received no notices, warnings, or counseling regarding his job performance; nor had he been disciplined for any alleged misconduct. After receiving the termination letter, Willard attempted to invoke the grievance process described in Khotol's employee manual, which directs employees to discuss any work-related problem with their project manager first. But Bellamy—Willard's project manager—refused to discuss the termination and directed Willard to leave the premises. Although he was not represented by a union, Willard attempted to file a written grievance with the help of a union official. Koprowski refused to discuss the termination with the union official.

On August 22, 2003, Willard filed a complaint with the National Labor Relations Board (NLRB), alleging that Khotol terminated him "because of his activities in support of the International Union of Operating Engineers, Local 302." Because of this, the complaint said, the dismissal violated Willard's rights under section 7 of the National Labor Relations Act (NLRA). In response to an inquiry to Khotol from the NLRB, Bellamy drafted—but did not send—a letter stating that Willard was terminated for "insubordination and failure to follow established shop procedures." The letter further stated that Willard had "refused to acknowledge or follow instructions" from two supervisors, failed to follow procedures related to the "daily maintenance and fueling of each operator's equipment," and had left equipment parked in an unsafe manner. Finally, the letter described a "situation" in which Willard raised a safety concern that Bellamy concluded was unfounded. According to Bellamy, Willard's complaint and the investigation it triggered "caused the Company a great deal [of] lost time, backlog of work, and led to hard feelings with the contractor." Bellamy's draft letter apparently served as the basis for Khotol's formal response to the NLRB, which was sent by Koprowski. Koprowski's letter, dated September 29, 2003, provided greater detail about Willard's alleged acts of insubordination and flatly de-

nied that his termination was related to—or in retaliation for—union-organizing activities. In October 2003, the NLRB notified Khotol that Willard had withdrawn his unfair labor practice charge against the company.

## B. Proceedings

In December 2003 Willard sued Khotol in superior court in Anchorage, asserting three causes of action: wrongful discharge, breach of the covenant of good faith and fair dealing, and breach of employment contract. As part of the second and third claims, Willard alleged that Khotol dismissed him because of his efforts to secure union representation. Specifically, the implied-covenant claim asserted that "Defendant's discharge of Plaintiff was a pretextual discharge for union organization." And the breach-of-contract claim stated that the "termination ... was done in retaliation for Mr. Willard's efforts to secure union representation for his fellow co-workers."

In response, Khotol filed a motion to dismiss, arguing that all three of Willard's claims were preempted by the NLRA. On April 2, 2004, after briefing and oral arguments by both parties, the superior court dismissed the second and third claims—the implied-covenant and breach-of-contract claims—with leave to amend. The court ruled that both claims were preempted by federal law. The superior court left the wrongful discharge claim intact because, as pled, it did not refer to Willard's union-related actions.

Three weeks later, on April 22, 2004, Willard filed an amended complaint that omitted the references to Khotol's alleged anti-union bias and reasserted Willard's first three claims, while adding two new claims: misrep-

resentation and false misrepresentations to procure employment.

Khotol then filed a motion for summary judgment, arguing that all of Willard's claims were without merit because he was an "at will" employee and could be terminated without cause. On May 9, 2005, following oral arguments and supplemental briefing, the court granted Willard's motion to compel discovery and gave both parties permission to file supplemental briefing. Finally, on November 10, 2005, the court granted summary judgment for Khotol on all claims, followed by a final judgment in Khotol's favor on December 5, 2005.

Willard appeals.

## III. DISCUSSION

We review de novo a superior court's order granting summary judgment.[2] We must consider the entire record in the light most favorable to the non-moving party.[3] We will uphold summary judgment only if the record presents no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[4]

### A. Willard's Breach–of–Covenant Claim

Willard argues that the superior court erred in ruling that he failed to raise a question of material fact as to whether his discharge violated the covenant of good faith and fair dealing, which is implied in all employment contracts in Alaska.[5]

 Breach of the implied covenant may be either subjective or objective.[6] To prove breach on subjective grounds, an employee must show that the employer acted with a

**2.** *Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995); *Bishop v. Municipality of Anchorage,* 899 P.2d 149, 153 (Alaska 1995).

**3.** *Olson v. Teck Cominco Alaska, Inc.,* 144 P.3d 459, 463 (Alaska 2006).

**4.** *Nielson,* 903 P.2d at 1052; *Bishop,* 899 P.2d at 153.

**5.** *Mitford v. de Lasala,* 666 P.2d 1000, 1006 (Alaska 1983) ("Every contract imposes upon each party a duty of good faith and fair dealing in its

performance or its enforcement.") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)); *see also Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 792 (Alaska 1986) (complaint that alleged retaliatory discharge stated an enforceable cause of action under covenant of good faith and fair dealing implied in employment contracts).

**6.** *Pitka v. Interior Reg'l Hous. Auth.,* 54 P.3d 785, 789 (Alaska 2002).

bad-faith purpose.[7] Apart from avoidance of bad faith, the covenant requires parties to an employment contract to "act in a manner which a reasonable person would regard as fair."[8] While the determination of fairness is inherently fact specific, we have held that the covenant "requires that an employer treat like employees alike"-and that failure to do so can give rise to a claim for breach under the objective test.[9] Similarly, proof that an employer's actions violated public policy may qualify as a breach of the objective prong of the implied covenant.[10]

Willard asserts four theories in support of his argument that Khotol breached the implied covenant of good faith and fair dealing. Specifically, he alleges that Khotol fired him in retaliation for requesting safety equipment in violation of public policy; failed to ensure that all employees who violated health and safety rules received equal treatment; violated its own rules and regulations in terminating Willard; and fired Willard because of his supervisor's personal animosity toward him.

Willard's allegation that Khotol fired him in retaliation for requesting necessary safety equipment relies largely on Bellamy's draft letter to the NLRB. During his deposition, Bellamy acknowledged that the letter's purpose was to "explain the termination of Jim Willard." The letter states that Willard was terminated for insubordination and failing to follow "established shop procedures." It gives several examples of Willard's alleged misconduct, and then describes Willard's complaints regarding a task that he believed was unsafe due to the presence of harmful gases. In dismissing Willard's concerns, Bellamy wrote:

> Upon investigation by myself into this matter I found that the operation as set forth was completely safe and the level of gases present would be a matter of personal discomfort. His position on this matter caused the Company a great deal [of] lost time, backlog of work, and led to hard

feelings with the contractor, the Shaw Group.

> Khotol Services Corporation emphasizes a safe, team oriented environment for our employees. Mr. Willard indicated to me on more than one occasion that he was not interested in being a part of this team.

The "operation" in question involved the cleaning of oil-water separators installed where motor vehicles are maintained and repaired. The separators drain oil into waste-oil reservoirs, while diverting water into the sewage system. According to Bellamy's deposition testimony, the separators received periodic inspections and maintenance; employees checked pump operations weekly and drained and pressure washed the separators' tanks and reservoirs quarterly.

While Bellamy's deposition testimony indicates that Willard was asked only to check the equipment rather than clean it, Willard's affidavit states that Bellamy "directed [him] to work on the oil/water separators." The affidavit further claims that in response to Bellamy's request, Willard informed Bellamy that he (Willard) "would need the proper safety equipment in order to carry out this task." Willard insists that Bellamy never told him the work on the oil-water separators could be done without the requested safety equipment; nor did Bellamy tell Willard that his request would lead to a backlog of work, delays in meeting deadlines, or "hard feelings" with Khotol's contractor, the Shaw Group. To the contrary, Willard states, Bellamy eventually obtained the safety equipment he requested. Bellamy, for his part, acknowledged during his deposition that despite the concerns his draft letter to the NLRB expressed about the negative effects of Bellamy's requests for the safety equipment, Khotol had never actually experienced any economic problems or delays in the oil-water separator work attributable to his requests.

---

7. *Id.* at 789.

8. *Id.*

9. *Jones v. Cent. Peninsula Gen. Hosp.*, 779 P.2d 783, 789 n. 6 (Alaska 1989); *see also Rutledge v.*

*Alyeska Pipeline Serv. Co.*, 727 P.2d 1050, 1056 (Alaska 1986).

10. *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1130 (Alaska 1989) (*Luedtke I* ).

This evidence, viewed in the light most favorable to Willard, supports an inference that Willard's request for safety equipment was reasonable, but that Khotol supervisors viewed it as an annoyance and used it as a reason to terminate Willard for insubordination. Willard's claim that his request was reasonable finds further support in the deposition testimony of Steve Holtery, who, when asked if it was ever his job to acquire safety equipment for use on the oil-water separators, stated: "My job, no, it's not my job, but we ordered the equipment in. We got the things that they were saying was needed. ..." While Holtery did not explicitly identify who "they" referred to, his testimony in response to other questions suggests he was referring to employees formerly with the Department of Public Works at Fort Richardson, who had previously supervised maintenance of the oil-water separators. Holtery also acknowledged that Khotol initially purchased the wrong type of air mask or filter. After learning of the mistake, he said, "we went and got the correct filters."

Yet despite Holtery's apparent recognition of the need for safety equipment in connection with work on the oil-water separators, his deposition testimony suggests that managers at Khotol viewed Willard's request for safety equipment as a nettlesome delay or hindrance. Asked about Willard's work assignments, Holtery responded:

A: Well, there's a lot of things that we wanted everybody to do. We wanted everybody because it was such a small work force to be able to cross craft, and we wanted him to do oil/water separators, but we had a problem with that.

Q: What was the problem with ...

A: He didn't want to do them. I can understand.

Q: Was he assigned to do oil/water separation?

A: No. We didn't have time to debate. No, we ...

Q: I guess I'm confused. Was he ever asked to do ...

A: I think he was, but every time it came up, there was questions about operational procedures and then we'd have to stop and go check on what safety equipment was required....

We have previously held that firing an employee in retaliation for requesting safety equipment gives rise to a cause of action for breach of the implied duty of good faith and fair dealing.[11] For example, in *Reed v. Municipality of Anchorage*, we held that a municipal employee discharged in retaliation for "whistle blowing" by filing job safety and health complaints had a valid common law claim for breach of the implied covenant.[12] As in *Reed*, Willard's case involves a claim of retaliatory discharge in connection with his request for safety equipment.

Khotol responds by downplaying the significance of Bellamy's draft letter to the NLRB and asserts that "other than his conclusory allegations Mr. Willard presented no evidence to support this claim." Khotol further asserts that Bellamy's investigation of the oil-separator "operation" and his conclusion that it was "completely safe," support the company's position that Willard was fired for insubordination and failure to follow company procedures—and not for requesting safety equipment. As Khotol sees it, Willard's equipment requests "provided confirmation of Willard's resistance, both passive and active, to the direction of his supervisors."

In dismissing Willard's retaliatory discharge theory, the superior court agreed with Khotol's position, stating: "[A]s Defendant points out, Plaintiff's conclusory allegations, made for the first time in his supplemental opposition, do not create a factual issue whereby a reasonable jury might conclude that Khotol acted in an objectively unfair manner in terminating Plaintiff." We disagree. Here, Willard relied on both the Bellamy letter and his own affidavit in support of his complaint. In addition, when

11. *Reed v. Municipality of Anchorage*, 782 P.2d 1155, 1158–59 (Alaska 1989); *see also Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 438 (Alaska 2004).

12. *Reed*, 782 P.2d at 1158–59.

viewed in the light most favorable to Willard, Bellamy's and Holtery's deposition testimony supports Willard's retaliatory-discharge claim. Khotol's position, as adopted by the superior court, fails to reflect a view of the evidence in the light most favorable to Willard—the approach required for ruling on Khotol's motion for summary judgment.

Moreover, the evidence available at summary judgment fails to support Khotol's claim that it made a good faith effort to confirm that Willard's equipment requests were unreasonable and that its investigation therefore "provided confirmation of Willard's resistance, both passive and active, to the direction of his supervisors." "[I]t is possible for an employer to rightfully terminate an employee but to do so in a way that violates the covenant of good faith and fair dealing."[13] But if the employer makes a good faith determination that the misconduct occurred, "there is no breach of the implied covenant ..., even if the employee could subsequently prove that the factual finding of misconduct was a mistake."[14]

In *Holland v. Union Oil Co. of California, Inc.*, on which Khotol relies, we affirmed summary judgment for Unocal.[15] There, Holland planned to do an independent project using a significant amount of company materials and time, but failed to obtain permission to do the project as required by company policy.[16] Two of Holland's supervisors conducted an investigation; they determined that Holland had not told them the truth and that his behavior demonstrated poor judgment, both of which justified his demotion.[17] We concluded that Unocal's actions, as a matter of law, could not reasonably be considered objectively unfair, because two supervisors had investigated the misconduct charges against Holland, including interviewing all of the parties involved.[18]

In contrast, the record here indicates that Bellamy's "investigation" of Willard's requests consisted of second-hand information from a Department of Public Works supervisor at Fort Richardson who told Bellamy that an earlier investigation—the date of which was not stated—had shown that "there w[ere] no toxic gas[ ]es to a level that would harm an individual." The record provides no further details to support Khotol's claim that it had investigated the reasonableness of Willard's request. And Bellamy acknowledged that his brief conversation with the Department of Public Works supervisor was the "principal basis" of his effort to determine the validity of Willard's requests for safety equipment. This evidence does not provide a reasonable factual basis to support the conclusory assertion in Bellamy's draft letter to the NLRB that, "[u]pon investigation by myself ... I found that the operation ... was completely safe and the level of gases present would be a matter of personal discomfort."

For these reasons, we conclude that there are sufficient genuine issues of material fact regarding Willard's retaliatory discharge theory to support his cause of action for breach of the implied covenant of good faith and fair dealing.[19]

13. *Alaska Marine Pilots v. Hendsch*, 950 P.2d 98, 109 (Alaska 1997).

14. *Holland v. Union Oil Co. of Calif., Inc.*, 993 P.2d 1026, 1035 (Alaska 2000).

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. Willard also asserts that Khotol breached the implied covenant when it failed to treat like employees alike regarding alleged health and safety rule violations and that this disparate treatment was objectively unfair. On appeal, Willard argues that he established triable issues of fact in connection with this theory and that in dismissing this basis for his breach-of-covenant claim, the superior court improperly applied a "high evidentiary threshold ... inconsistent with Alaska case law." Because we hold below that Willard was a probationary employee, we conclude that the implied covenant did not entitle Willard to be treated equally by Khotol when it sanctioned him for violating health and safety rules. For the same reason, we conclude that Khotol's alleged failure to follow its own policies regarding non-probationary employees did not result in a breach of the implied covenant. And because Willard's allegations that personal animosity led to his dismissal meshes with his retaliatory discharge theory, we see no need to address the animosity theory separately here.

## B. Willard's Wrongful Discharge and Breach–of–Contract Claims

Willard's amended complaint asserts that Khotol is liable for wrongful discharge and breach of his employment contract. Both claims rely on a theory that Willard could only be fired for just cause and was entitled to certain job protections, including an opportunity to dispute his termination through company grievance procedures. In support of this theory, Willard relies primarily on our decision in *Jones v. Central Peninsula General Hospital*[20] and language in Khotol's employee manual to argue that the manual fostered a reasonable expectation that he could only be legally discharged "for cause."

In granting Khotol summary judgment on these claims, the superior court compared the facts of this case to *Jones* and concluded that, unlike the provisions of the manual at issue in *Jones,* certain disclaimers in Khotol's manual and Khotol's employment application made it clear that, as a matter of law, Willard remained an at-will employee. The superior court thus concluded that the manual did not affect Willard's at-will status, so he could be legally discharged with or without just cause. On appeal, Willard contends that the superior court improperly distinguished *Jones* and renews his argument that the manual, taken as a whole, fostered a reasonable expectation that he could only be fired for cause and was entitled to certain procedural job protections.

■ While *Jones* recognized that personnel manuals can sometimes modify at-will employment agreements by creating expectations of specific job protections, we conclude that *Jones* has no bearing on Willard's case because uncontroverted evidence establishes that Willard was still a probationary employee. Khotol's employee manual unambiguously provided that, as such, he could be fired "at any time" during his first three months of employment if his attitude, habits, attendance or job performance did not measure up to Khotol's standards.

Willard was on the job for only six weeks before being fired. The Khotol manual defines the probation period as extending for "90 days, commencing on the date of hire, during which time the employee must demonstrate the ability to perform the job." The manual further describes probation as a "tryout time" for both employee and employer, during which the company may dismiss the employer for reasons related to "work habits, attitude, attendance or performance." The manual's only guarantee to probationary employees is that they will receive "several evaluations" of their job performance during the ninety-day period, followed by a final review at the end of probation.

Willard contends that, even though he fell within the manual's description of a probationary employee, Khotol did not regard him as having probationary status. He disputes his probationary status on three specific grounds: he notes that company officials never told him he was on probation; he asserts that he never received probationary evaluations; and he points out that he received holiday pay for July 4, contrary to the manual's statement that probationary employees are not eligible for such pay.

Willard's arguments are unpersuasive. Nothing in the manual suggests that new employees must be told that they are on probationary status before they fall into that category; instead, the manual classifies all new employees as probationary workers. Moreover, Khotol's alleged failure to give Willard an evaluation during his six weeks on the job does not support a reasonable inference that he was not on probation. While the manual promises "several evaluations" during the ninety-day probation period, it does not specify when the evaluations must occur within the ninety-day period. Likewise Willard's unexplained receipt of holiday pay for July 4th does not support a reasonable expectation of non-probationary status.

■ Courts in other jurisdictions have generally recognized that, absent specific contractual protections, probationary employees may be dismissed for any non-discrimina-

---

**20.** *Jones v. Cent. Peninsula Gen. Hosp.,* 779 P.2d 783, 787 (Alaska 1989) (holding that a personnel manual issued by the employer had been incorporated into the plaintiff's at-will employment agreement, so that the plaintiff could only be terminated for cause).

tory reason or no reason at all.[21] Similarly, we have consistently recognized that in the absence of statutory or contractual provisions to the contrary, probationary employees traditionally are accorded minimal procedural and substantive job protections.[22] In sum, Willard's attempt to raise claims under *Jones* for wrongful discharge and breach of contract fails as a matter of law because Khotol's employee manual unequivocally made him a probationary employee and gave him no right or reasonable expectation of a right to pursue these claims. We thus affirm the superior court's decision on these claims.

## C. Willard's Misrepresentation Claim

Willard's amended complaint separately asserted a claim for misrepresentation, alleging that Khotol misrepresented three conditions or terms of his employment through its employee manual: (1) the right to progressive discipline, (2) the right to not be terminated without just cause, and (3) that any dismissal would be subject to the company's grievance procedure. Willard's complaint does not specify whether the misrepresentation claim is based on negligent or fraudulent misrepresentation. The superior court ruled that Willard failed to supply enough evidence to withstand summary judgment under either theory. The court ruled that the negligent misrepresentation claim lacked legal merit because the record established that Willard did not rely on the employee manual in deciding to accept the job. Similarly, the court ruled that a fraudulent misrepresentation claim was destined to fail because of Willard's lack of reliance or, alternatively, because Willard failed to offer any evidence

that Khotol knowingly or intentionally made misrepresentations in its manual.

Willard now asserts that the superior court erroneously failed to consider his argument that he reported Holtery's alleged harassment in reliance on statements in the employee manual. Willard also contends that the court failed to consider his argument that Khotol's characterization of Willard as an "at will" employee proves that Khotol never intended to honor the manual's promise that "[n]o employee will be dismissed without just cause and all dismissals will be subject to the grievance procedures."

Khotol responds that Willard presented no evidence of reliance. Citing the Restatement (Second) of Torts,[23] Khotol asserts that even if we accept Willard's premise that Khotol knew that the manual's promises about grievance procedures and discharge only for good cause were false, Willard would not have been justified in relying on those promises. Khotol argues that Willard's reliance was unjustifiable because the relevant provisions conflict with other provisions in the manual and the employment application, which state that all at-will employees may be terminated at any time and for any reason.

The Restatement (Second) of Torts § 552 defines the four elements required to establish negligent misrepresentation as: (1) the party accused of misrepresentation must have made the statement in the course of his business, profession or employment; (2) the representation must supply "false information"; (3) the plaintiff must show "justifiable reliance" on the false information; and (4) the accused party must have failed "to exercise reasonable care or competence in obtain-

---

**21.** *E.g., Pinto v. Wynstra,* 43 Misc.2d 363, 250 N.Y.S.2d 1012, 1015 (Sup.Ct.1964) ("It has heretofore been regarded as well settled that the appointment of a teacher may be terminated, with or without cause, at any time during the probationary period, and that a teacher so situated has no right of review."); *Commonwealth, Dep't of Health v. Graham,* 58 Pa.Cmwlth. 409, 427 A.2d 1279, 1281 (1981) (holding that as long as state agency's reasons for dismissing a probationary employee are job-related and not tainted by discriminatory motive, the court will not substitute its judgment for the agency's or weigh the sufficiency of the evidence supporting the agency's decision).

**22.** *See, e.g., Cassel v. State, Dep't of Admin.,* 14 P.3d 278, 283–84 (Alaska 2000); *Univ. of Alaska v. Tovsen,* 835 P.2d 445, 447 (Alaska 1992); *Van Gorder v. Matanuska–Susitna Borough Sch. Dist.,* 513 P.2d 1094, 1096 (Alaska 1973).

**23.** RESTATEMENT (SECOND) OF TORTS § 537 (1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable.").

ing or communicating the information."[24] Fraudulent misrepresentation requires an additional element: proof that the party making the misrepresentation knew that it was untrue.[25]

■ We agree with Khotol that Willard's misrepresentation claim fails because the record does not include any evidence supporting the requisite element of justified reliance. As the superior court noted, the evidence shows that Willard could not have relied on the statements in the employee manual in accepting the job with Khotol. Willard stated in his deposition that he accepted the job on June 2, 2003 by signing a written job offer and calling a company official to convey his acceptance. Yet he did not receive the employee manual until June 12 and failed to read it until sometime after that date. Willard also offered no support for his assertion that he relied on the employee manual in deciding to report Holtery's alleged harassment. In his reply brief, Willard points to his own deposition testimony that he read the employee manual's policy on harassment to find out "[h]ow we were supposed to be treated." Yet the harassment section says nothing about for-cause employment or grievance procedures. Moreover, the manual specifically requires reports of alleged harassment to be in writing and states that they must contain specific details. Willard failed to comply with either requirement.

Because Willard has failed to offer evidence supporting a finding of justified reliance on any alleged misrepresentation, we affirm the superior court's dismissal of Willard's misrepresentation claim.

### D. Effect of Federal Preemption on Evidence of Anti–Union Bias

After Khotol moved to dismiss Willard's original complaint, the superior court indicated that it was inclined to dismiss two of Willard's claims because they were preempted by the NLRA.[26] The first claim asserted

that Khotol breached the implied covenant of good faith and fair dealing and alleged in part that Willard's termination by Khotol was "a pretextual discharge for union organization." The second claim was for breach of contract; among other things, it asserted that Khotol breached its employment contract with Willard "in retaliation for [his] efforts to secure union representation for his fellow co-workers." In stating its intent to dismiss these claims, the court proposed to enter the dismissals without prejudice to allow amendment of Willard's complaint. In reply, Willard's attorney stated: "I think that's probably appropriate for relief as long as Mr. Willard has the opportunity to amend his complaint." After the court dismissed the claims as preempted, Willard amended his complaint to remove all references to his involvement in efforts at union organization.

On appeal, Willard challenges the court's order dismissing his original claims. He argues that, because his union activities formed only a part of those claims, the claims were not barred by federal preemption. In Willard's view,

> [t]he fact that the complaint alleged his participation in union activities as one of several reasons for his discharge did not justify dismissal and the requirement that the complaint be amended to eliminate reference to [Khotol]'s bad faith actions.... Evidence of [Khotol]'s bad faith in terminating Willard for his union organizing activities is both proper and relevant to his claim for breach of the covenant of good faith and fair dealing, and therefore he should have been permitted to allege such facts in his complaint and be able to present such evidence at a jury trial.

■ In response, Khotol contends as a preliminary matter that Willard's attorney waived the right to challenge the superior court's preemption ruling by expressly telling the superior court that its proposal to dismiss the original claims was "probably appropriate." But the statement by Willard's

---

**24.** *Id.* § 552(1); *see also Bubbel v. Wien Air Alaska, Inc.,* 682 P.2d 374, 380 (Alaska 1984).

**25.** *Bubbel,* 682 P.2d at 381 (citing RESTATEMENT (SECOND) OF TORTS § 530 cmt. b).

**26.** *See* 29 U.S.C. §§ 157–158 (2000).

counsel cannot fairly be construed as acquiescence to the court's ruling on preemption. After the superior court proposed to dismiss the two claims as preempted, it qualified this proposal by suggesting that the dismissal could be entered without prejudice. The ensuing response by Willard's counsel focused on the suggested remedy of allowing amendment: "I think that's probably appropriate for relief as long as Mr. Willard has the opportunity to amend his complaint."

■ When viewed in context, Willard's counsel simply agreed that if the court followed through with its proposal to dismiss the two claims, it would be appropriate to allow Willard the opportunity to amend his complaint. Indeed, the ensuing colloquy between Willard's counsel and the superior court confirms this interpretation by making it clear that Willard's counsel continued to disagree with the court's ruling of preemption. For instance, when the court later reiterated that it favored the approach of dismissal without prejudice, Willard's attorney replied, "Again, I think this whole idea [of preemption under federal case law] is misconstrued because there are no federal issues involved here aside from the reference to union activities."[27] Because we conclude that Willard did not waive the point, we turn to the merits of his claim that the superior court misapplied the doctrine of federal preemption.[28]

In *San Diego Building Trades Council, Millmen's Union, Local 2020, Building Material and Dump Drivers, Local 36 v. Garmon,*[29] the United States Supreme Court announced two general guidelines for courts to follow in assessing the permissible scope of state regulation of conduct touching on labor-management relations. First, the Court declared, "state jurisdiction must yield" when the activity in question is clearly protected or prohibited by the NLRA.[30] Second, the Court stated, both federal and state courts must defer to the "exclusive competence of the National Labor Relations Board" when an activity is "arguably subject" to § 7[31] or § 8[32] of the NLRA.[33]

■ But the Court has also warned against applying these guidelines in a "literal, mechanical fashion."[34] In *Garmon* the Court carved out specific exceptions to preemption for matters that are of only peripheral concern to the NLRA, or that are so deeply rooted in local law as to make it unreasonable to assume that Congress intended to preempt state law from applying.[35] The Court also has stressed the need to weigh the state's interest in adjudicating the type of claim asserted against the possibility of interference with the NLRB's regulatory jurisdiction.[36] Under this balancing test,

---

27. Notably, after making this point, Willard's attorney supported it by specifically calling the court's attention to *Mitford v. de Lasala,* 666 P.2d 1000 (Alaska 1983)-one of the main cases he currently relies on in challenging the superior court's preemption decision.

28. On questions of law, this court is not bound by the lower court's decision; our duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

29. *San Diego Bldg. Trades Council, Millmen's Union, Local 2020, Bldg. Material & Dump Drivers, Local 36 v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

30. *Id.* at 244, 79 S.Ct. 773.

31. Section 7 of the NLRA protects the rights of employees to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

32. Section 8 of the NLRA makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

33. *Garmon,* 359 U.S. at 245, 79 S.Ct. 773.

34. *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 188, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); *see also Garmon,* 359 U.S. at 246–47, 79 S.Ct. 773; *Farmer v. Carpenters,* 430 U.S. 290, 302, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) ("Our cases indicate ... that inflexible application of the doctrine is to be avoided....").

35. *Garmon,* 359 U.S. at 244, 79 S.Ct. 773.

36. *Sears,* 436 U.S. at 189, 98 S.Ct. 1745; *Vaca v. Sipes,* 386 U.S. 171, 180, 87 S.Ct. 903, 17

when conduct is "arguably prohibited" by the NLRA, a critical inquiry is "whether the controversy presented to the state court is identical with that which could be presented to the [NLRB]."[37] For example, in *Sears, Roebuck & Co. v. Carpenters,* the court held that a state trespass action was not preempted because the state action focused only on the location of the picketing, while a complaint to the NLRB would have focused on the substance and object of the picketing.[38]

 Willard contends on appeal that *Garmon* preemption did not apply to his original implied-covenant claim, because it included theories independent of the allegations of anti-union bias. In particular, he contends, because his original implied-covenant claim included allegations that his termination was based on "personal animosity" and that it violated public policy—factual allegations falling beyond the range of NLRB jurisdiction—the original claim was not "factually identical" to his potential federal claim, and so was not barred by *Garmon* preemption.

 Furthermore, regarding his amended complaint, Willard argues that because the implied-covenant claim now does not allege anti-union bias at all—resting completely on independent grounds—*Garmon* preemption does not bar him from introducing evidence tending to show anti-union bias, so long as it is relevant to support the independent state-law claims he actually seeks to prove.

Willard supports this argument with a California Court of Appeal case, *Kelecheva v. MultiVision Cable T.V. Corp.*[39] In *Kelecheva,* a former supervisor alleged that he was subjected to harassment and discharged for refusing to "spy on and write up" co-workers involved in a unionization effort.[40] He sued his employer for wrongful termination, breach of an implied employment contract, and breach of the covenant of good faith and fair dealing.[41] The California Court of Appeal ultimately held that the plaintiff's state-law contract claims were not preempted, because the state litigation would focus on issues distinctly different from those that could have been raised before the NLRB.[42] In particular, the court noted that the contract did not require a showing of an unlawful motive and that the implied-covenant claim would likely focus on whether the defendant followed its own personnel rules or falsified the asserted grounds for discharge.[43] Under these circumstances, the court observed, the plaintiff would not be required to prove that the employer discharged him for reasons that violated federal labor law.[44] Noting the state's "substantial interest" in providing contract remedies for employees not covered by collective bargaining agreements, the court concluded that this interest outweighed any "marginal effect" that adjudication of the state-law claims would have on national labor policy.[45] Accordingly, *Kelecheva* held that the state claims were not barred, stating:

> Although evidence of defendant's anti-union animus may be relevant to plaintiff's claim of breach of the covenant of good faith and fair dealing, plaintiff would *not* be required to prove that defendant, in fact, discharged him for reasons that would violate federal or state labor law.[46]

L.Ed.2d 842 (1967); *see also Farmer,* 430 U.S. at 295–96, 97 S.Ct. 1056 ("[B]ecause Congress has refrained from providing specific directions with respect to the scope of pre-empted state regulation, the Court has been unwilling to declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions . . . .") (internal quotations omitted).

37. *Belknap v. Hale,* 463 U.S. 491, 510, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983).

38. *Sears,* 436 U.S. at 198, 98 S.Ct. 1745.

39. *Kelecheva v. Multivision Cable T.V. Corp.,* 18 Cal.App.4th 521, 22 Cal.Rptr.2d 453 (1993).

40. *Id.* at 454–55.

41. *Id.* at 455.

42. *Id.* at 459.

43. *Id.*

44. *Id.*

45. *Id.*

46. *Id.*

In response to Willard's reliance on *Kelecheva*, Khotol insists that the superior court correctly dismissed the claims in Willard's original complaint under *Garmon* and that Willard cannot escape preemption merely by characterizing his complaints as state contract claims. Khotol rests its argument on cases from other jurisdictions in which courts found state-law contract claims preempted under *Garmon*. But those cases—namely, *Foreman v. AS Mid–America, Inc.*[47] and *Young v. Caterpillar, Inc.*[48]—are distinguishable from Willard's. Both involved state-law claims that centered on the ways in which employees were treated or reinstated to their jobs following the resolution of labor strikes. And in both cases, the courts specifically found that the employers' strike-related conduct provided the sole basis for the state claims, and was identical to the conduct that could have been, or had been, presented to the NLRB.[49]

In *Foreman* non-union replacement workers sued their former employer for breach of contract in connection with harassment and intimidation perpetrated by union workers returning to work after a strike.[50] The Nebraska Supreme Court found that the employer's failure to provide harassment-free work—as it had promised to do—was "actually or arguably" prohibited by the NLRA because the inaction amounted to condonation or protection of misconduct attributed to the union.[51] The court thus concluded that the company's failure to act was "not merely a peripheral concern to federal labor law, but, rather, [was] so inextricably intertwined with federal labor law that to do other than preempt appellants' alleged breach-of-contract claims would obfuscate the NLRB's ability to adjudicate controversies" under its purview.[52]

Similarly, in *Young*, a group of employees sued their employer in state court for failing to reinstate them immediately after a strike concluded.[53] While the plaintiffs claimed that the employer had breached their individual employment contracts by delaying reinstatement, the court found that the plaintiffs' claims were "in essence unfair labor practices claims under section 8 of the [NLRA]."[54] The court concluded that "[d]espite attempts to dress the claims as breach of contract, the actual issues presented to the state court would be identical to those presented to the [NLRB] in an unfair labor practices claim."[55] The court thus concluded that the claims were preempted.

By contrast, Willard's original complaint provided two potential bases for his breach-of-covenant claim that did not necessarily hinge on his allegations of anti-union bias—that his termination violated public policy and/or was based on personal animosity. As amended, his complaint does not allege anti-union bias. Thus, the issues to be considered by a state court are not identical to those originally presented to the NLRB. *Foreman* and *Young* are not persuasive authority for preemption here.

Khotol also argues that Willard's reliance on *Kelecheva* is misplaced, particularly as to whether his anti-union bias is admissible in support of his implied-covenant of good faith and fair dealing claim. Khotol contends that if *Kelecheva* represents "good law" consistent with United States Supreme Court precedent, it cannot be interpreted as permitting evidence of anti-union bias to be admissible in support of a state claim, even if the evidence of bias is relevant to that claim. Further, Khotol insists that *Kelecheva's* reference to the potential relevance of anti-union animus is merely dicta that "indicates the opposite point—that regardless of the 'rele-

**47.** *Foreman v. AS Mid–America, Inc.*, 255 Neb. 323, 586 N.W.2d 290 (1998).

**48.** *Young v. Caterpillar, Inc.*, 258 Ill.App.3d 792, 196 Ill.Dec. 285, 629 N.E.2d 830 (1994).

**49.** *Foreman*, 586 N.W.2d at 301; *Young*, 196 Ill.Dec. at 288–89, 629 N.E.2d at 833–34.

**50.** *Foreman*, 586 N.W.2d at 296–97.

**51.** *Id.* at 301.

**52.** *Id.*

**53.** *Young*, 196 Ill.Dec. at 287, 629 N.E.2d at 832.

**54.** *Id.*, 196 Ill.Dec. at 288, 629 N.E.2d at 833.

**55.** *Id.*

vance' of the evidence of anti-union animus, such evidence 'would *not* be required to prove' his claim."

Although *Kelecheva's* meaning is somewhat unclear, we agree with Willard's reading of the case. The implied-covenant claim in Willard's first superior court complaint included an allegation that he had been fired in retaliation for his efforts to secure union representation. That allegation was essentially identical to the one he initially made to the NLRB. Standing alone, it raised a matter within the ambit of NLRB's jurisdictional sphere. But Willard's claim advanced two other implied-covenant theories that could stand independently. As originally raised, and as later elaborated on in Willard's amended complaint, these theories—that Willard's termination violated public policy and/or that it was prompted by his supervisors' "personal animosity" toward him—fall outside the ambit of federal concern, even though the conduct they allege might have been motivated by hostility resulting from Willard's union activity.[56] Accordingly, these theories were not preempted.

Moreover, if these independent theories were tried in the superior court and evidence of anti-union animus became genuinely relevant to support them, we would see no reason why the admissibility of the evidence of bias should not be governed by the Alaska Rules of Evidence. The rules of evidence give trial courts broad discretion to exclude relevant evidence when its prejudicial impact or potential for confusion outweighs its probative value.[57] Here, if Willard offered to use evidence of Khotol's anti-union bias not just to impeach Khotol's claim that he was fired for insubordination, but also to suggest that Khotol breached the implied covenant by firing Willard for engaging in union-related activities, then the evidence could be excluded because of its tendency to inject confusing issues into the case that belong in a federal forum. Given the broad scope of the trial court's powers to exclude relevant evidence when its potential for confusion outweighs its probative value, we see no reason to fear that the superior court would hesitate to exclude it. On the other hand, though, if the evidence is relevant for impeachment and poses no risk of being mistaken as evidence offered to prove an element of Khotol's implied-covenant claim, federal preemption would not bar its admission.[58]

On remand, then, the superior court should determine questions concerning the admissibility of such evidence under the Alaska Rules of Evidence, keeping a careful eye on the purposes underlying the doctrine of preemption adopted in *Garmon.*

## IV. CONCLUSION

Because Willard presented evidence raising genuine issues of material fact in connection with his claim that Khotol violated the implied covenant of good faith and fair dealing, we REVERSE the superior court's decision on this claim and REMAND for further proceedings consistent with this opinion. We also conclude that, on remand, evidence of Khotol's alleged anti-union bias may be admitted to support Willard's implied-covenant claim so long as it is relevant and does not supply, or pose an undue risk of appearing to supply, an essential element of the claim. We AFFIRM the superior court's decision in all other respects.

EASTAUGH, Justice, not participating.

---

56. *See Roberts v. Auto. Club of Mich.*, 138 Mich. App. 488, 360 N.W.2d 224, 228 (1985) (State court jurisdiction over breach of implied employment contract claim not preempted where state court would focus on existence of contract and breach, while NLRB would focus on whether employer bargained in good faith to a bona fide impasse before unilaterally imposing changes in terms and conditions of employment.).

57. *See* Alaska R. Evid. 403.

58. Our ruling that Willard's breach-of-contract claim fails as a matter of law for reasons unrelated to preemption makes it unnecessary to consider the issue of preemption in connection with that claim.