*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BROOKS RANGE PETROLEUM CORPORATION, | ) ) ) | Supreme Court Nos. S-16382 |
| Petitioner, | ) ) | Superior Court No. 2BA-15-00300 CI |
| v. | ) ) | O P I N I O N |
| DANIEL P. SHEARER, | ) ) | No. 7266 – July 27, 2018 |
| Respondent. | ) ) ) | |

Petition for Review from the Superior Court of the State of Alaska, Second Judicial District, Barrow, Angela Greene, Judge.

Appearances: Elizabeth Hodes and Anne Marie Tavella, Davis Wright Tremaine LLP, Anchorage, for Petitioner. James K. Wilkens, Bliss Wilkens, Anchorage, and Robert Campbell, Caliber Law Group, Barrow, for Respondent.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

We granted a petition for review to resolve a venue dispute in an employment case. Daniel Shearer alleges that Brooks Range Petroleum Corporation (BRPC) promised him a ten-year term of employment, then terminated his employment two and a half years later. Shearer filed suit in the Second Judicial District, where he

alleged the parties had negotiated and formed their contract. BRPC filed a motion to dismiss the case or to change venue to the Third Judicial District, where the contract was executed and where Shearer had performed most of his job duties. The superior court denied the motion, thus retaining venue in the Second Judicial District.

We conclude that neither Shearer's tort claims nor his contract-based claims arose in the Second Judicial District, and the chosen venue was therefore not proper. We reverse the superior court's order denying a change of venue.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Some of the factual background of this case is controverted. Where there is a reasonable dispute, we construe the facts in Shearer's favor.[1]

Shearer, a resident of Alberta, Canada, alleged that in October 2011 he was "working as a drilling consultant for British Petroleum" (BP) when he was "presented an attractive offer of full time employment with BP." While considering BP's offer, Shearer learned that the "key drilling consultant" for another North Slope operator, BRPC, had suffered a heart attack, and he "volunteered to help." He covered the consultant position for BRPC during January 2012 at the Mustang location near Nuiqsut.[2]

While working there Shearer was approached by John Jay "Bo" Darrah, BRPC's co-founder and then-chief executive officer, who "recruited" Shearer to "fill a

---

[1]    *See infra* Section IV.A.

[2]    Nuiqsut is a village in the North Slope Borough, about 35 miles inland from the Bering Sea, east of Utqiaġvik (formerly known as Barrow). Both Nuiqsut and Utqiaġvik are in the Second Judicial District. Utqiaġvik is the superior court location closest to Nuiqsut.

permanent full-time position with BRPC." Shearer told Darrah about BP's employment offer, "emphasizing the importance . . . of long-term employment security." According to Shearer, he and Darrah "verbally confirm[ed] [a] guarantee of long-term employment security of at least 10 years . . . [and] shook hands on the agreement." "In reliance on these promises and representations," Shearer ceased negotiating for a permanent position with BP.

On January 30, 2012, Shearer traveled to Anchorage and attended a dinner hosted by BRPC, where he was "welcomed and introduced as the 'new employee.' " The next day the parties executed a short written employment contract at BRPC's Anchorage office, effective February 1, 2012. The contract made no reference to a guaranteed term of employment.

The parties dispute where the terms of their agreement were negotiated and accepted. Shearer contends that the agreement was fully negotiated at BRPC's Mustang location on the North Slope and that the written contract executed in Anchorage simply "memorializ[ed] the basic compensation terms of the verbal employment contract . . . reached earlier." BRPC contends that it negotiated the material terms of the agreement and hired Shearer in Anchorage.

The parties also dispute where Shearer was expected to do his work. Shearer contends that he was hired to work primarily on the North Slope, though he concedes that he "would be expected to work in BRPC's Anchorage office during periods when there was no activity on the North Slope." BRPC contends that "Shearer was hired to work as a Drilling Manager in BRPC's Anchorage, Alaska office," but it concedes that "Shearer did travel to the project site on the North Slope." The parties agree that, as it turned out, Shearer worked primarily at BRPC's Anchorage office.

In 2014 Shearer learned that BRPC might be sold. He met with the president and chief executive officer, Barton J. Armfield, and another BRPC employee, and he reminded them of Darrah's oral commitment to a ten-year employment term. But in August 2015 he "was verbally advised by Armfield that his employment would be terminated." He was called the next day by another corporate officer, who advised him that "he would be receiving a letter informing him of his release from employment." BRPC asserts that its phone calls were made from Anchorage and the termination letter was sent from Anchorage to Shearer's home in Canada, which Shearer does not dispute.

B.     Proceedings

Shearer sued BRPC for misrepresentation, breach of contract, and related claims. He served the summons and complaint on Armfield, BRPC's registered agent, in Anchorage in the Third Judicial District, but he filed his suit in Utqiaġvik in the Second Judicial District. The parties dispute the location of BRPC's principal place of business: Shearer's complaint asserted that it was on the "North Slope, Alaska," but BRPC responded that it was in Anchorage. In an affidavit filed in support of BRPC's motion to change venue, Armfield asserted that it "does not maintain any permanent offices or employees in the Second Judicial District or Barrow [Utqiaġvik]" and that it "currently ha[d] no employees or active operations in" the Second Judicial District. In a responsive affidavit Shearer asserted that he was "informed and believe[d] there [was] current activity at BRPC's Mustang Pad" on the North Slope and that he also believed "that BRPC [was] in the process of designing a production facility that [would] be situated near Nuiqsut, within the Second Judicial District."

BRPC filed a motion to dismiss for improper venue or alternatively to transfer venue to Anchorage in the Third Judicial District. The superior court in Utqiaġvik considered the parties' pleadings and affidavits and denied the motion. It

decided that Shearer's contract claims arose in Anchorage for venue purposes because that was "the place of intended performance for Shearer's employment contract," but that his tort claims arose in the Second Judicial District because he "was first injured when he relied on BRPC's alleged misrepresentations in Nuiqsut" by "ceas[ing] negotiations with BP."

To decide whether venue for the two different types of claims could remain in Utqiaġvik, the court weighed the private interests of the litigants and the interests of the public. It noted that Shearer had a private interest in the venue of his choice but that "it would be easier and cheaper for BRPC to litigate the case in Anchorage"; "it is likely that most of the witnesses reside in Anchorage"; "it would be easier for witnesses outside of Alaska to travel to Anchorage" than to Utqiaġvik; and "most of the evidence is in Anchorage." But the court also noted that the cost of transporting employment records from Anchorage to Utqiaġvik was "minimal given that the entire contents could be put on a thumb drive or CD" and that "[w]itnesses c[ould] be deposed in Anchorage," though they "would have to testify in [Utqiaġvik] if the parties felt it necessary to have the live testimony."

The superior court decided that these private interests were outweighed by the public interest of "the local community . . . in having this controversy decided on the North Slope because a significant portion of the alleged wrongdoing occurred in Nuiqsut." The court concluded that because BRPC chose to do business on the North Slope — whose residents "work in those jobs and depend on the money to sustain them" — local jurors had "a stake in the matter" that weighed heavily in favor of retaining venue in the Second Judicial District. The court also declined to transfer venue on

convenience grounds, finding that it was not necessary for "the convenience of witnesses and the ends of justice."[3]

The parties filed cross-petitions for review.[4] We granted BRPC's petition and asked the parties to address the following issues:

> (1) Where did the claim arise for the alleged tort of misrepresentation?
>
> (2) Where did the claim arise for the alleged breach of contract?
>
> (3) Should we adopt the doctrine of ancillary (or pendent) venue?
>
> (4) Did the superior court abuse its discretion in denying a change of venue under AS 22.10.040?
>
> (5) How should we address issues of overlapping venue?

## III. STANDARD OF REVIEW

Whether the plaintiff's initial choice of venue is proper under Alaska Civil Rule 3(c) is a legal question we review de novo, applying our independent judgment to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[5]

---

[3] *See* AS 22.10.040(2) ("The superior court in which the action is pending may change the place of trial in an action from one place . . . to a designated place in another judicial district . . . when the convenience of witnesses and the ends of justice would be promoted by the change.").

[4] Shearer's petition challenged only the superior court's factual finding that the parties intended his employment contract to be primarily performed in Anchorage.

[5] *See Wolff v. Cunningham*, 187 P.3d 479, 482 (Alaska 2008) ("The superior court's interpretation of the civil rules presents a question of law that we review de novo."); *Ketchikan Gen. Hosp. v. Dunnagan*, 757 P.2d 57, 59 (Alaska 1988) (explaining (continued...)

## IV. DISCUSSION

Venue requirements "are designed to [e]nsure that litigation is lodged in a convenient forum and to protect the defendant against being sued in an arbitrary place."[6] Though important, venue has rarely been addressed in our case law. In the discussion that follows we first address how trial courts should view the evidence on a motion based on improper venue. We then address the tests used to determine where tort and contract claims arise for venue purposes. Applying those tests to Shearer's claims in this case, we decide that the Second Judicial District was not a proper venue because the claims did not arise there.

---

[5]   (...continued) that superior court's discretion when granting Rule 3 motion based on improper venue is limited to two choices: transferring case to proper judicial district or, "if the court finds that the plaintiff acted in bad faith, or if the interests of justice so require," dismissing action). Our de novo review of decisions based on improper venue is distinct from our review of decisions whether to change venue from one proper Rule 3(c) venue to another under AS 22.10.040; those we review for an abuse of discretion. *See Maier v. City of Ketchikan*, 403 P.2d 34, 39 (Alaska 1965) ("Within the boundaries of [the statutory] standards, the decision as to whether venue will be changed is within the sound discretion of the superior court."), *overruled on other grounds by Johnson v. City of Fairbanks*, 583 P.2d 181, 187 (Alaska 1978).

[6]   4 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & ADAM N. STEINMAN, FEDERAL PRACTICE AND PROCEDURE § 1063, at 330 (4th ed. 2015) (discussing federal venue requirements imposed by statute); *see also Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-84 (1979) ("In most instances, the purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." (emphasis in original)).

**A.** **The Plaintiff Bears The Burden Of Proving Proper Venue; However, Absent An Evidentiary Hearing, The Court Evaluates The Pleadings In The Light Most Favorable To The Plaintiff.**

By statute, "[v]enue for all actions shall be set under rules adopted by the supreme court."[7] Alaska Civil Rule 3 governs venue. Actions involving real property are addressed by Rule 3(b); other civil actions are addressed by Rule 3(c). "[P]laintiffs . . . must commence suit in [a] proper Rule 3 venue, and then, if that forum is inconvenient, move for a change of venue under AS 22.10.040."[8] "This rule precludes plaintiffs from selecting a forum they believe is convenient without regard to Civil Rule 3."[9]

Alaska Civil Rule 12(b) allows objections based on improper venue to be asserted in a responsive pleading or made by motion. Because our Rule 12(b) is substantially similar to Federal Rule of Civil Procedure 12(b),[10] we look to federal practice for guidance in applying the rule. In the federal courts there is a split of authority over who bears the burden of proof on the question of proper venue.[11] Some courts require a moving defendant to bear the burden of proving that the plaintiff's choice of venue is improper,[12] but an apparent majority — and what Professors Wright and Miller

---

[7]    AS 22.10.030.

[8]    *Ketchikan Gen. Hosp.*, 757 P.2d at 59.

[9]    *Id.*

[10]    *Compare* Alaska R. Civ. P. 12(b), *with* Fed. R. Civ. P. 12(b). *See generally* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1352, at 322 (3d ed. 2004 & Supp. 2017).

[11]    WRIGHT & MILLER, *supra* note 10, § 1352, at 320-22.

[12]    *See, e.g.*, *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724-25 (3d Cir. 1982); *United States v. Orshek*, 164 F.2d 741, 742 (8th Cir. 1947); *see also* WRIGHT & MILLER, *supra* note 10, § 1352, at 324.

deem the "correct" view — places the burden of proof on the plaintiff, reasoning that it is the plaintiff's obligation in the first instance to file suit in a proper forum.[13]

We follow the majority view, which is more consistent with our expectation that plaintiffs will "commence suit in the proper Rule 3 venue."[14] To withstand a motion based on improper venue, the plaintiff must present a prima facie case that the chosen venue is proper.[15] The trial court may consider evidence outside the pleadings but should take the plaintiff's uncontradicted allegations as true and construe reasonable inferences and factual conflicts in favor of the plaintiff.[16]

"As a result, at least until facts are resolved, in many cases the non-moving party will survive the Rule 12(b)(3) motion" solely because of the lack of factual development.[17] "To resolve such motions when genuine factual issues are raised, it may be appropriate for the [trial] court to hold a Rule 12(b)(3) motion in abeyance until [it]

---

[13]     *See, e.g.*, *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 816 (4th Cir. 1979), *abrogated on other grounds by Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982); *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979); *see also* WRIGHT & MILLER, *supra* note 10, § 1352, at 322.

[14]     *Ketchikan Gen. Hosp. v. Dunnagan*, 757 P.2d 57, 59 (Alaska 1988).

[15]     *See Samson Tug & Barge Co. v. Koziol*, 869 F. Supp. 2d 1001, 1015 (D. Alaska 2012) ("When considering a defendant's assertion of improper venue, the court may consider facts outside of the pleadings, with the burden on the plaintiff to demonstrate that venue properly lies in its chosen state.").

[16]     *See Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990) ("When affidavits conflict, the court is inclined to give greater weight to the plaintiff's version of the jurisdictional facts and to construe such facts in the light most favorable to the plaintiff."); WRIGHT & MILLER, *supra* note 10, at 322.

[17]     *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004).

holds an evidentiary hearing on the disputed facts."[18] Whether to hold a hearing is committed to the trial court's discretion.[19] "Alternatively, the [trial] court may deny the Rule 12(b)(3) motion while granting leave to refile it if further development of the record eliminates any genuine factual issue."[20] If the court does hold an evidentiary hearing, the plaintiff must prove that the chosen venue is proper by a preponderance of the evidence.[21]

B.    **The Second Judicial District Is Not A Proper Venue For Shearer's Misrepresentation Claims Because The Claims Did Not Arise There.**

As relevant here, Rule 3(c) provides that "[i]f . . . a defendant can be personally served within a judicial district of the State of Alaska, the action may be commenced either in:  (1) the judicial district in which the claim arose; or (2) a judicial district where the defendant may be personally served."  Shearer served BRPC in Anchorage, in the Third Judicial District, and venue is proper there under Rule 3(c)(2). Shearer does not contend that BRPC could also have been personally served in the Second Judicial District; our focus is therefore on whether his "claim arose" there, which would make it an alternative proper venue under Rule 3(c)(1).

---

[18]    *Id.*

[19]    *See id.*

[20]    *Id.*; *see also Hancock v. AT&T*, 701 F.3d 1248, 1260-61 (10th Cir. 2012) (approving procedure as described by Ninth Circuit in *Murphy*), *abrogated on other grounds by Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49 (2013).

[21]    *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 447-48 (E.D.N.Y. 2013).

Shearer's complaint alleges claims in both tort and contract. His tort claims, which we address first, are for negligent[22] and intentional misrepresentation.[23] Both types of misrepresentation claims require that the plaintiff have suffered actual harm.[24]

We first decided where a tort "claim arose" for venue purposes in *Ebell v. Seapac Fisheries, Inc.*[25] At the time, venue in cases not involving real property was governed by AS 22.10.030(b) — since repealed — which presaged Civil Rule 3(c). The statute provided: "If . . . a defendant can be personally served within a judicial district of

---

[22]     The tort of negligent misrepresentation has these elements:

> (1) the party accused of misrepresentation must have made the statement in the course of his business, profession or employment; (2) the representation must supply "false information"; (3) the plaintiff must show "justifiable reliance" on the false information; and (4) the accused party must have failed "to exercise reasonable care or competence in obtaining or communicating the information."

*Miller v. State, Dep't of Envtl. Conservation*, 353 P.3d 346, 348 (Alaska 2015) (quoting *Willard v. Khotol Servs. Corp.*, 171 P.3d 108, 118-19 (Alaska 2007)).

[23]     "We have identified the elements of intentional misrepresentation as '(1) a misrepresentation of fact or intention, (2) made fraudulently (i.e., with scienter), (3) for the purpose of inducing another to act in reliance, (4) with justifiable reliance by the recipient, (5) causing loss.' " *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp. (Anchorage Chrysler II)*, 221 P.3d 977, 987-88 (Alaska 2009) (quoting *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp. (Anchorage Chrysler I)*, 129 P.3d 905, 914 (Alaska 2006)).

[24]     *Bubbel v. Wien Air Alaska, Inc.*, 682 P.2d 374, 381 (Alaska 1984) ("[A] cause of action for negligent misrepresentation is complete when the injured party has suffered a pecuniary loss as a result of the misrepresentation."); *Anchorage Chrysler II*, 221 P.3d at 987-88 (identifying fifth element of intentional misrepresentation as "loss" caused by the tortious conduct).

[25]     692 P.2d 956 (Alaska 1984).

-11-                                                                                                7266

the state, the action against that defendant shall be commenced in that judicial district or in the judicial district in which the claim arose." The plaintiff in *Ebell* alleged that a law firm located in the Third Judicial District was negligent in failing to advise him of the need to comply with certain fisheries laws, "resulting in the seizure of [the plaintiff's] vessels in Norton Sound in the Second Judicial District."[26] The seized vessels were ordered to Dutch Harbor in the Third Judicial District, where eventually the fish on board were forfeited "and other losses were incurred."[27]

The plaintiff served the law firm with a summons and complaint in the Third Judicial District, the firm's place of business, but filed suit in the Second.[28] The superior court denied the defendants' motion to change venue, determining that the "claim arose" in the Second Judicial District where "the injury occurred."[29] This court affirmed.[30] We observed that "[w]hen AS 22.10.030(b) was enacted in 1971, the 'claim arose' language had a generally understood meaning in the context of tort suits," which was that a claim "arose where the last event necessary to make the defendant liable for the tort took place."[31] We further explained:

> The last event occurred when the harmful force, set in motion
> by the defendant's negligence, first took effect on the body or
> the property of the plaintiff. Thus, a claim for tort arose where

---

[26] *Id.* at 957.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

the harmful force first took effect, or where the plaintiff suffered injury.[32]

We concluded in *Ebell* that although the "harmful force" may have been initiated in the Third Judicial District, where the allegedly negligent advice was given, "the harmful force first took effect when the vessels were seized in the Second Judicial District"; it was therefore "appropriate to say that the Second Judicial District [was] a district in which the claim arose."[33]

When a tort is complete is a question that also arises in the context of statutes of limitations. "[T]he statute of limitation[s] as to torts does not usually begin to run until the tort is complete," which ordinarily does not occur "until there has been an invasion of a legally protected interest of the plaintiff."[34] In *Jones v. Westbrook* we considered a claim that a lawyer, retained to help sell a business, had committed malpractice by failing to ensure that his client had a recorded security interest in the business's physical assets.[35] Over seven years later the Internal Revenue Service filed tax liens against the assets, displacing the client's unsecured interest; we held it was only then

---

[32] *Id.*

[33] *Id.* at 958. *See generally Green v. N. Arundel Hosp. Ass'n*, 730 A.2d 221, 229 n.8 (Md. Spec. App. 1999) (stating that "[o]ur research has revealed that the majority of our sister states with venue statutes similar to ours have held that a tort cause of action arises at the place of injury" and citing *Ebell* and other cases).

[34] *Jones v. Westbrook*, 379 P.3d 963, 968 (Alaska 2016) (quoting *Austin v. Fulton Ins. Co.*, 444 P.2d 536, 539 (Alaska 1968)).

[35] *Id.* at 964-65.

that the malpractice claim was completed by the occurrence of "an appreciable injury" to the client.[36]

In *Austin v Fulton Insurance Co.*, an insured alleged that his insurer had negligently failed to provide requested earthquake coverage.[37] The alleged negligence occurred in 1961, but the insured was not aware of it until after the 1964 earthquake, when he suffered an uncovered loss.[38] We concluded that the statute of limitations began to run in 1964, reasoning that the insured's interests were not invaded until he needed the coverage and discovered that he lacked it.[39] We held that "there must be an injury or harm to [the insured] as a consequence of [the insurer's] negligence to serve as a basis for recovery of damages before the tort became actionable and before the period of limitation commenced to run."[40] We supported this conclusion by reference to the First Restatement of Torts, which states: "A cause of action for misrepresentation in a business transaction is complete when the injured person has been deprived of his property or otherwise has suffered pecuniary loss or has incurred liability as a result of a misrepresentation."[41]

In light of these authorities, we conclude that Shearer failed to make a prima facie case that his misrepresentation claims arose in the Second Judicial District. The record, viewed in the light most favorable to Shearer, shows that the alleged misrepresentations were made in the Second Judicial District, while his contract was

---

[36]    *Id.* at 967-69.

[37]    444 P.2d at 537-38.

[38]    *Id.* at 539.

[39]    *Id.* at 539-40.

[40]    *Id.* at 539.

[41]    *Id.* (quoting RESTATEMENT (FIRST) OF TORTS § 899 cmt. c (AM. LAW INST. 1939)).

being negotiated near Nuiqsut, and that Shearer justifiably relied on the misrepresentations in the Second Judicial District when he ceased negotiating for a full-time job with BP. But the representation and reliance elements of a tort claim are not enough to "make the defendant liable for the tort":[42] in fact there *was* no tort until Shearer had suffered a pecuniary loss, and he suffered no loss as long as he continued in BRPC's employ. The alleged misrepresentations — "the harmful force" — "took effect" on Shearer only when BRPC terminated his employment two and a half years later by telephone from Anchorage while he was at home in Canada. Because Shearer suffered no injury in the Second Judicial District, his tort claims cannot have arisen there for venue purposes.

Shearer argues that he first felt the harmful effect of the alleged misrepresentations in the Second Judicial District immediately after they were made, when he "gave up his full-time consulting work for BP on the North Slope and ceased negotiating the terms of permanent employment with BP, probably foregoing consideration of employment with BP forever." But Shearer had no tort claim at that time and no reason to sue BRPC. He was not injured by accepting the job he preferred in reliance on BRPC's alleged misrepresentations; the effect of the alleged misrepresentations was not harmful until he was terminated, completing the tort.

We have cautioned against blurring the reliance and loss elements of a misrepresentation claim. In *Anchorage Chrysler Center, Inc. v. DaimlerChrysler Motors Corp.* (*Anchorage Chrysler II*), a car dealership sued a manufacturer for misrepresentation in the context of failed plans to expand the dealership's business.[43] We considered

---

[42]     *See Ebell v. Seapac Fisheries, Inc.*, 692 P.2d 956, 957 (Alaska 1984).

[43]     221 P.3d 977, 980-82 (Alaska 2009).

whether the dealership had established the loss element of the misrepresentation claim.[44] While noting the existence of minor and unquantifiable losses made in reliance on the alleged misrepresentation, we rejected the dealership's claim that a weakening of its bargaining position was itself a harm that satisfied the elements of the tort.[45] We noted that "there is no precedent in Alaska for considering a change in bargaining position to constitute in itself a loss in a fraud action."[46] We explained that absent "unusual circumstances . . . [i]t would not be appropriate to generally broaden the fifth element of the fraudulent misrepresentation tort by treating changed bargaining position as, in and of itself, an actual loss."[47] We reasoned:

> In virtually any fraudulent misrepresentation case involving negotiations or a contract, the reliance element will involve the use of misrepresentation to influence what a party consents to do or not do. Equating a compromised bargaining position with actual loss would thus cause the loss and reliance elements of the tort to collapse into a single element. Every time a party could show that it acted in reliance on a fraudulent misrepresentation (the fourth element of the tort), it could automatically assert the misrepresentation harmed its bargaining power and caused a loss (the fifth element).[48]

Rejecting the dealership's argument that reliance itself equaled loss, we concluded that "[t]he loss in fraudulent misrepresentation must be a pecuniary loss that is *caused by* the

---

44      *Id.* at 987-92.

45      *Id.* at 991.

46      *Id.*

47      *Id.*

48      *Id.*

plaintiff's reliance on the misrepresentation."[49] Under this reasoning, we cannot accept Shearer's argument — adopted by the superior court — that the "harmful force" of BRPC's alleged tort took effect in Nuiqsut, when Shearer relied on the alleged misrepresentations to his later detriment.

It was therefore error for the superior court to conclude that Shearer's misrepresentation claims arose in the Second Judicial District.

### C. The Second Judicial District Is Not A Proper Venue For Shearer's Contract Claims Because The Claims Did Not Arise There.

#### 1. A breach of contract claim arises where a substantial part of the events giving rise to the claim occurred.

The contract-based claims asserted in Shearer's complaint included breach of contract, reformation, promissory estoppel, and breach of the covenant of good faith and fair dealing. In *Ebell* we concluded that the term "claim arose" as used in the venue statute had "a generally understood meaning" in tort law at the time the legislature adopted it and therefore "*as applied to tort suits* was meant to include the place of injury rule."[50] But in *Ebell* we did not address where a contract claim arose, nor have we done so since. We now decide that a breach of contract claim arises where a substantial part of the events giving rise to the claim occurred.

#### a. Other jurisdictions take a variety of approaches to determining where a "claim arose" for venue purposes.

As we recognized in *Ebell*, the federal venue statute in effect at the time had language similar to Alaska's: it allowed venue in "the judicial district . . . in which the

---

[49] *Id.* (emphasis added).

[50] *Ebell v. Seapac Fisheries, Inc.*, 692 P.2d 956, 957-58 (Alaska 1984) (emphasis added).

claim arose."[51] But federal interpretations of this language were never uniform. In *Leroy v. Great Western United Corp.*, construing the same phrase in 28 U.S.C. § 1391(b) (1976), the United States Supreme Court declined to decide "whether this language adopts the occasionally fictive assumption that a claim may arise in only one district"; it considered it "absolutely clear," however, "that Congress did not intend to . . . give [plaintiffs] an unfettered choice among a host of different districts."[52] Giving the language "the broadest interpretation . . . that is even arguably acceptable," the Court held that

> in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility — in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff) — may be assigned as the locus of the claim.[53]

---

[51]      *Id.* at 957 (quoting 28 U.S.C. § 1391(a)-(b) (1982) (amended 1990)). The federal statute was amended in 1990 to recognize that claims could arise in more than one district; the current language thus authorizes venue in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2) (2012); *see Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) (explaining congressional rationale for 1990 amendment).

[52]      443 U.S. 173, 184-85 (1979).

[53]      *Id.* at 185 (emphasis in original) (footnote omitted).

Finding this exegesis unhelpful,[54] federal courts continued to apply an array of approaches for determining where a "claim arose." Some courts applied "a test that considers the 'weight of the contacts' between the claim and the various districts in which venue may be appropriate."[55] Under this test, "venue would be proper in the district having the most significant ties to the claim."[56] A second test was the "substantial contacts" test (sometimes called "the American Law Institute rule"), under which "venue is proper in any district in which a substantial part of the events or omissions giving rise to the claim occurred."[57] Under this test — now reflected in the federal venue statute[58]

---

[54]  *See Broad. Co. of the Carolinas v. Flair Broad. Corp.*, 892 F.2d 372, 375 (4th Cir. 1989) ("Unfortunately, this language has spawned as much uncertainty as the wording of the 'claims arose' clauses . . . themselves."), *superseded by statute*, Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 311, 104 Stat. 5114 (1990), *as recognized by Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004); *Dody v. Brown*, 659 F. Supp. 541, 546 (W.D. Mo. 1987) (observing that "great confusion" over meaning of "claim arose" "has been further heightened by the United States Supreme Court's pronouncement in *Leroy*"); *Cheeseman v. Carey*, 485 F. Supp. 203, 213 (S.D.N.Y. 1980) ("The difficulties posed by *Leroy* seem certain to make venue issues an even greater problem for the lower federal courts than they were before the Supreme Court spoke.").

[55]  *Broad. Co. of the Carolinas*, 892 F.2d at 375.

[56]  *Id.* at 376; *see also DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 855 (11th Cir. 1988).

[57]  *Broad. Co. of the Carolinas*, 892 F.2d at 376; *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 260-61 (8th Cir. 1979) (explaining that the American Law Institute rule was "derived from the ALI Study of the Division of Jurisdiction Between the State and Federal Courts, §§ 1303, 1314 (1969)"); AM. LAW INST., STUDY OF THE DIVISION OF JURISDICTION BETWEEN STATE AND FEDERAL COURTS, §§ 1303, 1314 (1969).

[58]  *See* 28 U.S.C. § 1391(b)(2) (2012); *Magic Toyota, Inc. v. Se. Toyota*
(continued...)

— if venue could be situated in either of two districts with "approximately equal plausibility," the court did not weigh the two against each other: either district was a proper venue.[59] A third test relied on "the place of intended performance,"[60] which we discuss further below. State courts with "claim arose" language in their venue statutes have also followed a variety of approaches, finding proper venue where the contract was made, where it was breached, or where the damages occurred.[61]

In this case the superior court favored the "place of intended performance" rule adopted by the Ninth Circuit in *Decker Coal Co. v. Commonwealth Edison Co.*,[62]

---

[58] (...continued)
*Distribs., Inc.*, 784 F. Supp. 306, 317 (D.S.C. 1992) ("[T]he American Law Institute test . . . is almost identical to the newly implemented § 1391(b)(2).").

[59] *Arandia v. Marriott Corp.*, 668 F. Supp. 452, 453 (D. Md. 1987); *see also Cumis Ins. Soc'y, Inc. v. South-Coast Bank*, 587 F. Supp. 339, 346-48 (N.D. Ind. 1984).

[60] *Broad. Co. of the Carolinas*, 892 F.2d at 376-77.

[61] *See, e.g.*, *Precision Software, Inc. v. Gauthier*, 605 So. 2d 592, 594 (Fla. Dist. App. 1992) ("A cause of action for breach of contract is said to have accrued in the county where the breach occurred . . . [and] [a] breach is said to have occurred where failure of performance occurred."); *Corder v. Idaho Farmway, Inc.*, 986 P.2d 1019, 1024 (Idaho App. 1999) ("[F]or the purposes of venue, a breach of contract action arises in the county where the contract was made, where it was breached or where the damage occurred."); *State ex rel. Thornhill Grp., Inc. v. King*, 759 S.E.2d 795, 801 (W. Va. 2014) ("[T]he place where the cause of action arises in a breach of contract claim for purposes of venue selection [is] based on the tripartite aspects of a contractual claim (formation, breach, and damages) . . . [T]he facts relevant to a particular breach of contract claim will govern which of those three potential venue selections are appropriate in a given case.").

[62] 805 F.2d 834 (9th Cir. 1986), *superseded by statute* Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 311, 104 Stat. 5114 (1990).

which is the rule Shearer advocates on appeal.[63] *Decker Coal* involved a contract for the delivery of coal from Decker's Montana mine to electrical utilities in Illinois and Indiana.[64] The utility company argued "that the event giving rise to the claim was its transmittal of notice [from its Illinois offices] invoking the force majeure clause[;] therefore, the claim arose in Illinois."[65] But the Ninth Circuit decided that venue was proper in the place of intended performance, Montana, "because the place of performance is determined at the inception of the contract and therefore parties can anticipate where they may be sued."[66] It explained that this test was consistent with "[t]he overriding purpose of § 1391(a)," which "is to further the convenience of the parties," and it noted that "the place of performance is likely to have a close nexus to the underlying events."[67]

The Ninth Circuit's rationale suited the facts in *Decker Coal*, in which the contract was actually performed where the parties intended it to be performed, and "the convenience of the parties" — at least of the plaintiff — was undoubtedly furthered by the plaintiff's choice of venue in its own home district. But the rationale falters in a case like this one, in which the plaintiff contends that the contract was intended to be

---

[63]    The superior court found "that the place of intended performance for Shearer's employment contract was primarily in Anchorage" and "[t]herefore, venue may be proper in Anchorage" for Shearer's breach of contract claim.

[64]    *Decker Coal*, 805 F.2d at 837.

[65]    *Id.* at 842.

[66]    *Id.* Notably, venue for the claim was proper in Montana regardless of where the "claim arose," since the plaintiff was a Montana resident and "the judicial district where all plaintiffs . . . reside" is one proper choice for venue under 28 U.S.C. § 1391(a). *See id.* at 841-42. The Ninth Circuit concluded "that Montana venue is proper because Decker Coal is a resident of Montana *and* the claim arose there." *Id.* at 841 (emphasis added).

[67]    *Id.* at 842.

performed someplace other than where it was actually performed. According to Shearer, the parties intended that he work "primarily . . . on the North Slope when drilling commenced" and in Anchorage only "when there was no activity on the North Slope," but drilling was delayed and he "ended up working primarily out of the Anchorage office." When the parties intend to perform their contract in one location but ultimately perform it somewhere else, basing venue on their unrealized intentions would seem unlikely, as a rule, to "further the convenience of the parties" or "have a close nexus to the underlying events."[68]

We note that given the facts of *Decker Coal*, the rule the Ninth Circuit applied was really a "place of actual performance" rule, not a "place of intended performance" rule, despite how it was stated and later characterized.[69] If, for example, the parties had intended Decker to produce coal in Montana but it had shifted its operations to Pennsylvania where all the work actually took place, the Ninth Circuit is unlikely to have relied on a "place of intended performance" rule made by reference to "[t]he overriding purpose of" the venue statute — "further[ing] the convenience of the parties."[70] It was the place of *actual* performance that mattered. In this case, if we look to the place of *actual* performance — a place convenient to the parties, where at least one of them resides and where they can expect to find witnesses and employment records

---

**68** *Id.*

**69** *See, e.g.*, *Broad. Co. of the Carolinas v. Flair Broad. Corp.*, 892 F.2d 372, 376 (4th Cir. 1989), *superseded by statute*, Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 311, 104 Stat. 5114 (1990), *as recognized by Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004); *Lee v. Corr. Corp. of Am.*, 525 F. Supp. 2d 1238, 1242 n.3 (D. Haw. 2007); *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 560 (S.D.N.Y. 2004); *PKWare, Inc. v. Meade*, 79 F. Supp. 2d 1007, 1016 (E.D. Wis. 2000).

**70** *Decker Coal*, 805 F.2d at 842.

relevant to the plaintiff's claims — proper venue is the Third Judicial District, not the Second.

    **b.**  **The purposes of the venue rule are best served by a test that takes account of where "a substantial part of the events" underlying the claim occurred.**

    In *Ebell* we noted the development of the predominant "weight of the contacts" approach in federal case law, including its recent "utiliz[ation] in tort suits."[71] But while applying the "place of injury" rule to tort suits, we did "not reject the 'weight of the contacts' approach in all respects."[72] We cautioned, though, that a test requiring the weighing of contacts in different forums "seems to produce much litigation," and that parties could more productively focus their "attention on the statutory guidelines for changing venue" rather "than attempting the often imponderable task of enumerating and quantifying contacts in an effort to fulfill the 'occasionally fictive' quest for the one district in which the claim arose."[73] Ultimately, we "disapprove[d] of the weight of the contacts approach," but "only insofar as it assumes that there is but one district in which a claim may arise."[74]

    Given our caveat in *Ebell* — that a "weight of the contacts approach" should accommodate the possibility of a claim arising in more than one district — we conclude that the American Law Institute (ALI) test, which allows venue in any district in which

---

  [71] *Ebell v. Seapac Fisheries, Inc.*, 692 P.2d 956, 958 (Alaska 1984).

  [72] *Id.*

  [73] *Id.* at 958-59 (footnote omitted) (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 184-85 (1979)). Those statutory guidelines include "when there is reason to believe that an impartial trial cannot be had" and "when the convenience of witnesses and the ends of justice would be promoted by the change." AS 22.10.040(1)-(2); *see also Ebell*, 692 P.2d at 959 n.12 (quoting full text of statute).

  [74] *Ebell,* 692 P.2d at 959.

"a substantial part of the events or omissions giving rise to the claim occurred,"[75] best serves the purposes of Alaska's venue doctrine. The ALI test's "major purpose" is "to liberalize the weight of the contacts test by [e]nsuring that venue would be proper in more than one district,"[76] thus directly addressing our concern in *Ebell*.

The ALI test is the basis for the current version of the federal venue statute, which in 1990 replaced the phrase "*the* judicial district . . . in which the claim arose"[77] with the more inclusive phrase "*a* judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."[78] Federal courts have observed that Congress intended the new language to eliminate the "wasteful litigation"[79] and the "plethora of tests"[80] which up to then had been used to determine which of several

---

[75]    AM. LAW INST., STUDY OF THE DIVISION OF JURISDICTION BETWEEN STATE AND FEDERAL COURTS, §§ 1303, 1314 (1969).

[76]    *Dody v. Brown*, 659 F. Supp. 541, 547 (W.D. Mo. 1987).

[77]    28 U.S.C. § 1391(a)-(b) (1988) (emphasis added) (amended 1990).

[78]    28 U.S.C. § 1391(a)(2) (Supp. II 1991) (emphasis added) (amended 2011); *see Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994) ("The House Report noted that the new language was in accord with that recommended earlier by an American Law Institute study." (citing H.R. REP. NO. 101-734, at 23 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6860, 6869)).

[79]    *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001) ("Congress amended the statute to its current form because it found that the old language 'led to wasteful litigation whenever several different forums were involved in the transaction leading up to the dispute.' " (quoting *Cottman*, 36 F.3d at 294)); *see also Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) ("Congress believed that the old phrase was 'litigation-breeding,' partly because it did not cover the situation 'in which substantial parts of the underlying events have occurred in several districts.' " (quoting H.R. REP. NO. 101-734, at 23)).

[80]    *Uffner*, 244 F.3d at 42 ("The pre-amendment statute . . . engendered a
(continued...)

possible districts was the single one in which "the claim arose"; the amendment makes clear "that when the events underlying a claim have taken place in different places, venue may be proper in any number of districts."[81]

But federal courts have also observed that the amended statutory language did not change "the purpose of statutorily specified venue," which is still "to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial."[82] The "substantial part" language "is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute."[83] Thus, "[e]vents or omissions that might only have some tangential connection with the dispute in litigation are not enough."[84] "[S]*ignificant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere."[85] "And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be

---

[80]    (...continued)
plethora of tests to determine the single venue in which the claim 'arose.' ").

[81]    *Id.*; *see also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005) ("The new language contemplates that venue can be appropriate in more than one district."); *Jenkins Brick*, 321 F.3d at 1371 ("The new language thus contemplates some cases in which venue will be proper in two or more districts.").

[82]    *Cottman*, 36 F.3d at 294 (emphasis in original) (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-84 (1979)).

[83]    *Id.*

[84]    *Id.*; *see also Jenkins Brick*, 321 F.3d at 1371 ("Only the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered.").

[85]    *Gulf Ins.*, 417 F.3d at 357 (emphasis in original).

considered."[86]  The test is thus not to be confused with the "minimum contacts" test used for determining personal jurisdiction; "contacts" matter only to the extent they are the "events or omissions giving rise to the claim."[87]  The evolving federal standard, based on the ALI test, thus remains consistent with the operative phrase of our own venue rule, which turns on where the "claim arose" rather than where the parties have the most contacts.[88]

### 2.	A substantial part of the events giving rise to Shearer's breach of contract claim did not occur in the Second Judicial District.

In his affidavit opposing BRPC's venue motion, Shearer identified the contacts between his suit and the Second Judicial District.  First, he alleged that it was on the North Slope that BRPC offered, and he accepted, a ten-year term of employment.  Second, he alleged that the parties' expectation when he was hired was that he would "work in BRPC's Anchorage office during periods when there was no activity on the North Slope" but "would be primarily needed on the North Slope when drilling commenced."  Third, he alleged that "there [was] current activity at BRPC's Mustang Pad" on the North Slope and that he believed "BRPC is in the process of designing a production facility that will be situated near Nuiqsut."

---

[86]	*Jenkins Brick*, 321 F.3d at 1371.

[87]	*See Gulf Ins.*, 417 F.3d at 356-57 (quoting 28 U.S.C. § 1391(b) (2000) (amended 2011)) ("It would be error . . . to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries."); *Cottman*, 36 F.3d at 294 ("The test for determining venue is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.' ").

[88]	Alaska R. Civ. P. 3(c)(1).

A breach of contract claim depends on proof of the existence of a contract, breach, and damages.[89] "[E]ntry into an agreement does not automatically qualify as a substantial part of the events or omissions giving rise to a breach of contract claim."[90] Where a contract was negotiated, while sometimes important, may fade into insignificance if the contract is largely performed and breached somewhere else.[91] The "place of intended performance" rule which *Decker Coal* found to be consistent with the purpose of the venue doctrine — "to further the convenience of the parties"[92] — is thus

---

[89] *Great W. Sav. Bank v. George W. Easley Co.*, 778 P.2d 569, 577-78 (Alaska 1989) (holding that complaint alleging that defendant "had a contractual obligation to make direct payments to" plaintiff, defendant "breached this contract," and plaintiff "suffered damages" was sufficient for purposes of pleading breach of contract claim); *see Nicdao v. Chase Home Fin.*, 839 F. Supp. 2d 1051, 1068 (D. Alaska 2012) ("In order to assert a claim for breach of contract, a plaintiff must generally allege: (1) existence of a contract; (2) breach; (3) causation; and (4) damages.").

[90] *Abramoff v. Shake Consulting, L.L.C.*, 288 F. Supp. 2d 1, 5 (D.D.C. 2003) (concluding that although "the finalized agreement was a prerequisite to the defendants' alleged breach, . . . the act of finalizing the agreement was not itself wrongful and did not directly give rise to the plaintiff's claim").

[91] *See PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 757-58 (S.D.N.Y. 1995) (rejecting argument that oral agreement reached at New York toy fair was substantial part of events giving rise to breach of contract claim where initial discussions occurred in Arkansas, contract was finalized and executed after parties returned to their respective domiciles in Florida and Massachusetts, contract was not to be performed in New York, and alleged breach was of one party's obligation to prepare SEC documents in Florida and file them in Washington, D.C.).

[92] *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir. 1986), *superseded by statute* Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 311, 104 Stat. 5114 (1990).

still given primary, and often dispositive, weight by federal courts in the Ninth Circuit.[93] Where the contract was breached is usually an important factor.[94] And where the damage occurs may also be significant.[95]

The only one of the contacts Shearer identifies that is directly relevant to his breach of contract claims is the first — that the Second Judicial District was where employment was first discussed and offered. But in this case the site of the parties' alleged oral agreement appears to have had little to do with the alleged breach. Shearer's contract claims, based on the alleged oral promise of a ten-year term of employment, would be exactly the same if the discussions had occurred in Anchorage, Honolulu, or London. The intended place of performance was apparently not material to the parties' agreement; the alleged breach occurred after Shearer had spent three and a half years working primarily in Anchorage. There is no "close nexus to the wrong"[96] in either the

---

[93] *See, e.g.*, *Denari v. U.S. Dry Cleaning Servs. Corp.*, No. 1:17-CV-0031 AWI BAM, 2017 WL 2779051, at *5 (E.D. Cal. June 27, 2017); *Sussman Shank, LLP v. Citizens of Humanity, LLC*, No. 3:15-CV-02148-HZ, 2016 WL 9343891, at *8 (D. Or. April 18, 2016); *Ahead, LLC v. KASC, Inc.*, No. C13-0187JLR, 2013 WL 1747765, at *7 (W.D. Wash. Apr. 23, 2013).

[94] *See Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003) ("[M]ost importantly, the contract was breached when Bremer failed to perform his post-employment obligation to refrain from competing against Jenkins Brick — conduct that occurred only in Georgia."); *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 144, 150 (D.D.C. 2008) ("[T]he site of the alleged breach weighs heavily in the venue analysis." (citing *Abramoff*, 288 F. Supp. 2d at 2-5). *But cf. Decker Coal*, 805 F.2d at 842 (finding that venue in "the place of intended performance" rather than "the place of repudiation" better served "the spirit of § 1391(a)").

[95] *See Kirkpatrick v. Rays Grp.*, 71 F. Supp. 2d 204, 212 (W.D.N.Y. 1999) ("The place where the alleged harm occurred is also relevant for purposes of venue.").

[96] *Jenkins Brick*, 321 F.3d at 1372 (interpreting 28 U.S.C. § 1391(a)(2) (1994)
(continued...)

parties' expectation that Shearer would perform some of his work on the North Slope or BRPC's alleged activities there.

The agreement discussed on the North Slope was reduced to writing and signed when the parties were in Anchorage. The contract was largely performed in Anchorage, and for the duration of the parties' contractual relationship no events significant to Shearer's claims occurred in the Second Judicial District. Nothing about the breach itself — not the first oral notice to Shearer that he was to be terminated, the follow-up telephone call, the letter confirming his termination, his receipt of these messages, or any resulting harm — is alleged to have occurred in the Second Judicial District.

Finally, it is noteworthy that Shearer does not dispute BRPC's contention that there are no witnesses or relevant documents on the North Slope. In light of the purpose of the venue doctrine — which is still to protect a defendant against an unfair choice of venue with "no real relationship to the dispute"[97] — we conclude that the North Slope was not a place where "a substantial part of the events or omissions giving rise to the claim occurred."[98]

---

[96] (...continued) as "consider[ing] as relevant only those acts and omissions that have a close nexus to the wrong").

[97] *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994).

[98] *See* AM. LAW INST., STUDY OF THE DIVISION OF JURISDICTION BETWEEN STATE AND FEDERAL COURTS, §§ 1303, 1314 (1969).

**D.      We Do Not Need To Address The Remaining Issues On Which We Granted Review.**

Given our conclusion that Shearer's tort and contract claims did not arise in the Second Judicial District and that venue was not proper there for either type of claim, we do not need to decide the remaining issues on which we granted review.

**V.      CONCLUSION**

We REVERSE the superior court's order and REMAND with instructions to transfer the case to the Third Judicial District.